No. 3:21-cv-03765-WHO

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

---

IN RE: EVANDER FRANK KANE,

*Debtor.*

ZIONS BANCORPORATION, N.A.,

*Appellant,*

v.

EVANDER FRANK KANE,

*Appellee.*

On Appeal from the United States Bankruptcy Court
for the Northern District of California
Bankr. No. 21-50028-SLJ
Hon. Bankruptcy Judge Stephen L. Johnson

---

## APPELLEE'S RESPONSIVE BRIEF

---

Stephen D. Finestone
Ryan A. Witthans
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
(415) 606-0466
sfinestone@fhlawllp.com
rwitthans@fhlawllp.com

*Attorneys for Appellee,*
EVANDER FRANK KANE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................ 1

ISSUES PRESENTED AND STANDARDS OF REVIEW ..................... 3

    I.   Issues Presented ................................................... 3

    II.  Standard of Review .............................................. 3

STATEMENT OF THE CASE .............................................................. 7

    I.   Background and Events Prior to Kane's Bankruptcy ........... 7

    II.  Post-Bankruptcy Filing Events ......................................... 10

    III.  Zions' Conversion Motion .......................................... 12

    IV.  Kane's Opposition to the Conversion Motion ................... 14

    V.  Hearing on the Conversion Motion ..................................... 15

    VI.  The Bankruptcy Court's Ruling ....................................... 16

SUMMARY OF THE ARGUMENT ..................................................... 18

ARGUMENT ...................................................................................... 20

    I.   The Bankruptcy Court Properly Denied Conversion to Chapter 11 ................................................................... 20

        A.  Legal Standard ................................................. 20

        B.  The Bankruptcy Court Properly Analyzed the "Ability to Pay" Factor ....................................................... 22

        C.  The Bankruptcy Court Properly Analyzed the "Possibility of Immediate Reconversion" Factor ........................... 26

        D.  The Bankruptcy Court Properly Analyzed the "Likelihood of Plan Confirmation" Factor ..................................... 28

        E.  The Bankruptcy Court Properly Analyzed the "Accuracy of Schedules and Statements" Factor .............................. 36

        F.  The Bankruptcy Court Properly Analyzed the "Benefit to Parties in Interest" Factor ......................................... 37

    II.  The Bankruptcy Court Properly Declined to Appoint a Trustee  44

        A.  Legal Standards ............................................... 44

B. The Bankruptcy Court Found No Cause to Appoint a Trustee  46

C. Zions' Arguments Are Unavailing ..................................... 49

III. Conversion and Appointment of a Trustee Would Violate the Thirteenth Amendment ................................................. 51

A. Conversion to Chapter 11 Would Violate the Thirteenth Amendment ...................................................................... 51

B. Appointment of a Chapter 11 Trustee Would Violate the Thirteenth Amendment ................................................... 54

CONCLUSION ......................................................................... 58

CERTIFICATION OF COMPLIANCE FOR BRIEFS ............................ 59

# TABLE OF AUTHORITIES

### Cases

*Blausey v. United States Trustee*, 552 F.3d 1124 (9th Cir. 2009)............3

*Gebhardt v. Hardigan (In re Hardigan)*, 517 B.R. 379 (S.D. Ga. 2014).22

*In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650 (9th Cir. 1997)..........34

*In re Decker*, 535 B.R. 828 (Bankr. D. Alaska 2015) ........................20, 22

*In re Dixon*, 2010 Bank. LEXIS 3305, 2010 WL 3767604 (Bankr. N.D. Ca. 2010) ...............................................................................43

*In re Gordon*, 465 B.R. 683 (Bankr. N.D. Ga. 2012)............. 22, 26, 39, 40

*In re Hamilton*, 803 F. App'x 123 (9th Cir. 2020).................................30

*In re Hardigan*, 490 B.R. 437 (Bankr. S.D. Ga. 2013)....................22, 23

*In re Johnson*, 402 B.R. 851 (Bankr. N.D. Ind. 2009) ...........................31

*In re LaFountaine*, 2016 WL 3344003 (B.A.P. 9th Cir. June 7, 2016)...22

*In re Lobera*, 454 B.R. 824 (Bankr. D.N.M. 2011) ...............................23

*In re Parvin*, 538 B.R. 96 (Bankr. W.D. Wash. 2016)...........................20

*In re Perez*, 30 F.3d 1209 (9th Cir. 1994) ..............................................42

*In re Reed*, 890 F.2d 104 (8th Cir. 1989)...............................................42

*In re Schlehuber*, 489 B.R. 570 (B.A.P. 8th Cir. 2013) ..........................21

*In re Snyder*, 509 B.R. 945 (Bankr. D.N.M. 2014)................................23

*In re Takano*, 771 Fed. App'x 805 (9th Cir. 2019) ................................22

*Kearney v. Unsecured Creditors Comm.*, 625 B.R. 83 (B.A.P. 10th Cir. 2021)........................................................................................21

*Nagy v. Grp. Long Term Disability Plan for Emples. of Oracle Am., Inc.*, 739 F. App'x 366 (9th Cir. 2018).........................................................7

*Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500 (9th Cir. 1991) .......7

*Pullman-Standard, Div. of Pullman v. Swint*, 456 U.S. 273 (1982)........4

*Trafficschool.com, Inc. v. Edriver, Inc.*, 663 F.3d 820 (9th Cir. 2011) ...21

*U.S. Bank N.A. v. The Village at Lakeridge, LLC*, 138 S. Ct. 960 (2018) ..................................................................................... 4, 5, 6, 7

*Zachary v. Cal. Bank & Trust (In re Zachary)*, 811 F.3d 1191 (9th Cir. 2016)........................................................................................34

### Statutes

11 U.S.C. § 1104(a) ................................................................................3

11 U.S.C. § 1112 ............................................................................26, 27

11 U.S.C. § 1115 ............................................................................39, 40

11 U.S.C. § 1141 ............................................................................30, 31

11 U.S.C. § 330 .....................................................................................42

11 U.S.C. § 341 ................................................................. 11, 13

11 U.S.C. § 350 ..................................................................... 31

11 U.S.C. § 362 ..................................................................... 31

11 U.S.C. § 506(a) ................................................................. 25

11 U.S.C. § 521 ..................................................................... 12

11 U.S.C. § 706(b) .......................................................... passim

11 U.S.C. § 707 ............................................................... 20, 23

## Constitutional Provisions

U.S. Constitution Amend. XIII .................................... passim

## INTRODUCTION

This appeal and the related appeal by South River Capital, LLC[1]
("South River") arise from the bankruptcy court's denial of creditor-
appellant Zions Bancorporation, N.A.'s ("Zions") motion to convert
debtor-appellee Evander Frank Kane's ("Kane") bankruptcy case from
Chapter 7[2] to Chapter 11 and to appoint a Chapter 11 trustee in the
converted case (the "Conversion Motion"). In deciding a motion to
convert a case from Chapter 7 to Chapter 11, a bankruptcy court
considers various case-specific factors. The court is also by necessity
predicting what may happen in a hypothetical Chapter 11. Given the
multiple factors and the supposition about the future, the bankruptcy
court has broad discretion in deciding a motion to convert.

In its appeal, Zions argues that the bankruptcy court should have
converted the case to a Chapter 11 and appointed a Chapter 11 trustee.
Zions posits that the bankruptcy court did not adequately consider the

---

[1] *South River Capital, LLC v. Evander Frank Kane (In re Kane)*,
N.D. Cal. No. 3:21-cv-03493-WHO.

[2] Unless otherwise specified, all chapter and code references are to
the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

1

fact that creditors would likely receive a distribution in a Chapter 11 case. Zions further argues that the court envisioned a hypothetical "straw man" Chapter 11 plan that contained many obstacles to confirmation, but there were answers to all those problems, not the least of which was that creditors would vote to receive something rather than nothing.

In truth, Zions assumed that the amount of Kane's future salary and its allegations about his prepetition bad acts would be sufficient to carry the day. It did not provide in-depth analysis or information, or adequately respond to the significant issues Kane raised in opposition to the Conversion Motion. Now that the bankruptcy court has issued its detailed ruling, Zions claims it has additional answers. It is too late, however, and the answers provided in its appeal brief are no more convincing than those presented to the bankruptcy court.

As discussed below, the bankruptcy court properly applied the Bankruptcy Code and applicable case law. The court rejected the creditors' simplistic approach to the Conversion Motion, which was long on outrage and short on evidence and analysis.

Kane respectfully urges this Court to affirm the decision of the bankruptcy court.

## JURISDICTIONAL STATEMENT

Kane agrees with Zions regarding the basis and appropriateness of this Court's jurisdiction over this appeal, and that Zions' appeal was timely filed. Appellant's Opening Brief at 9.

## ISSUES PRESENTED AND STANDARDS OF REVIEW

### I.  Issues Presented

Quite simply, the two main questions presented in the appeal are:

1. Did the bankruptcy court commit error when it denied conversion of Kane's case from Chapter 7 to Chapter 11 pursuant to § 706(b)?

2. Did the bankruptcy court commit error when it denied appointment of a Chapter 11 trustee pursuant to § 1104(a)?

Zions presents several arguments under these main questions, each of which will be discussed in turn below.

### II.  Standard of Review

Zions asserts that the bankruptcy court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *Blausey v. United States Trustee*, 552 F.3d 1124, 1132 (9th Cir. 2009). The statement is correct as far as it goes. However, because the bankruptcy

3

court established facts, determined the appropriate legal test, and applied the legal test to the facts, this appeal also presents mixed questions of law and fact.[3] Accordingly, this standard of review also applies to much of what Zions asks this Court to review.

The United States Supreme Court has recently clarified the standard of review for mixed questions. *U.S. Bank N.A. v. The Village at Lakeridge, LLC*, 138 S. Ct. 960 (2018). In *Village at Lakeridge*, the Court held that the standard of review applied to mixed questions of law and fact depends on the specific type of mixed question at issue. *Id.* The issue presented in that case was whether a particular creditor was a "non-statutory insider" pursuant to bankruptcy law. *Id.* The parties disputed whether the historical facts determined by the bankruptcy court satisfied the legal test chosen for conferring non-statutory insider status, *i.e.*, a mixed question of law and fact. *Id.* at 966.

> We here arrive at the so-called "mixed question" of law and fact at the heart of this case. . . . [T]he Bankruptcy Court below had found a set of basic facts about Rabkin; and it had

---

[3] Mixed questions of law and fact are "questions in which the historical facts are admitted or established, the rule of law is [resolved], and the issue is whether the facts satisfy the statutory standard." *Pullman-Standard, Div. of Pullman v. Swint*, 456 U.S. 273, 289 n.19, (1982).

4

> adopted a legal test for non-statutory insider status . . . . As
> its last move, the court compared the one to the other—and
> determined that the facts found did not show the kind of
> preferential transaction necessary to turn a creditor into a
> non-statutory insider. For that decisive determination, what
> standard of review should apply?

*Id.* In answering that question, the Court noted that mixed questions
are not all alike. *Id.* at 967. Some questions require courts to "expound
on the law, particularly by amplifying or elaborating on a broad legal
standard," which appellate courts should review *de novo. Id.* But others

> immerse courts in case-specific factual issues—compelling
> them to marshal and weigh evidence, make credibility
> judgments, and otherwise address what we have
> (emphatically if a tad redundantly) called multifarious,
> fleeting, special, narrow facts that utterly resist
> generalization.

*Id.* (internal marks removed). When that is so, "appellate courts should
usually review a decision with deference." *Id.*

   With these standards in mind, the Court focused on the mixed
question presented: "Given all the basic facts found, was Rabkin's
purchase of MBP's claim conducted as if the two were strangers to each
other?" *Id.* at 968. "That," the Court noted, "is about as factual sounding
as any mixed question gets." *Id.*

> The court takes a raft of case-specific historical facts,
> considers them as a whole, balances them one against

5

another—all to make a determination that when two particular persons entered into a particular transaction, they were (or were not) acting like strangers. Just to describe that inquiry is to indicate where it (primarily) belongs: in the court that has presided over the presentation of evidence, that has heard all the witnesses, and that has both the closest and the deepest understanding of the record—*i.e.*, the bankruptcy court.

. . . . And that means the issue is not of the kind that appellate courts should take over.

. . . . A conclusion of that kind primarily rests with a bankruptcy court, subject only to review for clear error.

*Id.* at 968–69.

So too, here. The bankruptcy court considered a number of facts including (1) Kane's prepetition conduct, (2) his involvement with the Lenders (defined below), (3) his bankruptcy filings and his postpetition cooperation with the Chapter 7 trustee and United States Trustee, (4) his overall engagement in the bankruptcy process, (5) the particulars of his contract with the Sharks, and (6) the positions of the various creditors and what would likely or possibly unfold in a Chapter 11 case. Considering these facts, the bankruptcy court turned to whether Kane's case should be converted to Chapter 11 and found that it should not. It also determined that, even if were to convert the case, it would not appoint a Chapter 11 trustee. The bankruptcy court reached its

conclusions based upon a raft of case-specific facts and its conclusion should not be reversed absent clear error.

Under the clear-error standard, findings are reviewed "with a serious thumb on the scale" for the lower court. *Id.* at 966. For a finding to be clearly erroneous, it must strike the appellate court as "wrong with the force of a five-week old, unrefrigerated dead fish." *Nagy v. Grp. Long Term Disability Plan for Emples. of Oracle Am., Inc.*, 739 F. App'x 366, 368 (9th Cir. 2018) (quoting *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 502 (9th Cir. 1991)).

The bankruptcy court's findings are not clearly erroneous. To the contrary, they are well-considered and supported by the evidence. As such, the bankruptcy court's order should be affirmed.

## STATEMENT OF THE CASE

### I.  Background and Events Prior to Kane's Bankruptcy

Kane is a 29 year old professional hockey player who started playing professionally at the age of 18. ZionsER-269.[4] He is currently

---

[4] "ZionsER" citations are to Zions' excerpts of record, ECF 5-1, which bear "ZionsER" Bates stamps. "SER" citations are to Kane's supplemental excerpts of record, which are filed concurrently with this responsive brief.

under contract with the San Jose Sharks ("Sharks") and has played for the club since 2018. *Id.* At the time of filing this bankruptcy, Kane lived in San Jose, California, with his wife and their nine-month-old daughter. *Id.*

Through the "guidance" of an agent/broker, Sure Sports LLC ("Sure Sports") and its principal Leon McKenzie, Kane entered into numerous loans. ZionsER-270. The primary loans for purposes of this appeal and the underlying Conversion Motion were with Zions for $4.25 million, Centennial Bank ("Centennial") for $8 million, Professional Bank ("Professional Bank") for $1.5 million, South River for $600,000, and Lone Shark Holdings, LLC ("Lone Shark") for $750,000. Zions, Centennial, Professional Bank, South River, and Lone Shark are referred to collectively as the "Lenders."

Kane paid sizeable fees to Sure Sports to arrange the loans. *Id.* For example, on the Zions loan, Kane paid Sure Sports fees of approximately $67,000. *Id.* Unbeknownst to Kane at the time, the Lenders were also paying Sure Sports fees for directing Kane to them for loans. *Id.* Kane also learned that after he went into default on the loans, Sure Sports was providing the Lenders with recommendations on

8

attorneys to use in California and litigation strategy, including the

garnishing of Kane's salary. *Id.* Sure Sports' conduct forms the basis of

Kane's crossclaim against Sure Sports in litigation pending in Miami,

Florida, at the time of the bankruptcy filing. *Id.*

The loans were similar to one another. ZionsER-270, 275–84. The

loans generally included a Business Loan Agreement, promissory notes,

and additional documents seeking to securitize the loan against Kane's

future wages. *Id.* The loan documents did not include any of the

customary consumer disclosures and protections. *Id.* The moving party

acknowledged that Kane's debts are business debts. ZionsER-114.

Kane eventually defaulted on his loans with the Lenders and in

October 2019 he retained John Fiero of Pachulski Stang Ziehl & Jones

to restructure his debt. ZionsER-270. Mr. Fiero brought in Ben Cary, a

Certified Insolvency and Restructuring Advisor, to support the

restructuring efforts. ZionsER-287. Mr. Fiero concluded that the

Lenders' assertion of a security interest in Kane's future salary was

ineffective and contrary to the Uniform Commercial Code and so

advised the Lenders. *Id.* Mr. Fiero spent many months and more than

one hundred hours of attorney time seeking to reach a resolution with

9

the Lenders. ZionsER-288. The efforts were for naught, and the Lenders

filed suits against Kane in state and federal court. *Id.* Faced with multi-

front litigation, a cut in pay due to the COVID-19 pandemic, and far

more debt than he could conceivably manage, Kane filed for Chapter 7

bankruptcy on January 9, 2021. ZionsER-271, 002.

## II.  Post-Bankruptcy Filing Events

Fred Hjelmeset (the "Trustee") was appointed as Chapter 7

trustee, and he retained legal counsel (Gregg Kleiner) and an

accountant (Richard Pierotti). Kane cooperated fully in responding to

numerous requests for information from the Trustee as well as the

United States Trustee ("UST"). ZionsER-271. Among other things, he

provided (1) statements for all bank accounts going back to January

2020, (2) credit card statements, (3) prior years' federal and state tax

returns, (4) mortgage statements, (5) insurance information, (6)

information regarding various business entities and business ventures,

(7) a breakdown of the use of loan proceeds, (8) an explanation of

transactions reflected in bank statements and credit card statements,

(9) lease agreements, (10) loan agreements, and (11) various other

miscellaneous documents reflecting his debts and financial history. *Id.*

10

Kane also provided access to his home in San Jose, California, and real property in Vancouver, British Columbia, to realtors selected by the Trustee to opine as to the current value of the real property assets. *Id.* Kane accepted the valuations provided by the Trustee's realtors in reaching a settlement with the Trustee regarding the real estate and funds on account. *Id.* The Trustee filed a motion seeking approval of that settlement and Kane made the first installment payment of $55,000 to the Trustee prior to the hearing on the Conversion Motion. ZionsER-271–72.

Kane appeared for his initial § 341 meeting of creditors, which lasted approximately 2.5 hours, and appeared for a continued meeting on February 25, 2021. ZionsER-272. The continued meeting lasted approximately thirty minutes, after which time the Trustee concluded the meeting. *Id.* Kane continued providing documentation to the Trustee and United States Trustee as requested after the meetings. *Id.* Kane also amended his Schedules and Statement of Financial Affairs to provide additional or more detailed information to the Trustee and

creditors.[5] SER-003–11; ZionsER-075–94; SER-012–20; SER-021–30; ZionsER-095–106; SER-031–41.

Kane also stipulated with the United States Trustee and various creditors to extend the deadlines for filing complaints to determine dischargeability or object to discharge. ZionsER-272. In short, Kane acted as a responsible Chapter 7 debtor and fulfilled his duties under § 521 in what is, without question, a complicated and unusual case.

## III.  Zions' Conversion Motion

On February 26, 2021, Zions filed the Conversion Motion, seeking to convert the case to a Chapter 11 and simultaneously appoint a Chapter 11 trustee to take control of Kane's assets and future salary. ZionsER-108–26. As the only factual support for the Conversion Motion,

---

[5] One amendment pertained to a prepetition transfer of two Rolex watches to pay a debt. SER-027. At the meeting of creditors, Kane was asked numerous questions about items in his bank statements, which he had provided to the Trustee and United States Trustee. ZionsER-252, -257, -273–74. Often the entry in question involved payments to various creditors. *Id.* The questions triggered his memory about repaying debt with the transfer of the watches and that was something he added to the amended Statement of Financial Affairs. *Id.* No one asked about any Rolex watches or whether Kane had ever paid a creditor via transfer of property. *Id.* Far from being evidence of nefarious conduct, the amendments demonstrated Kane's efforts to comply with his obligations under the Bankruptcy Code. *Id.*

Zions filed (1) a declaration attaching Kane's contract with the Sharks, ZionsER-128–49; (2) a declaration of its counsel summarizing Kane's testimony at the meetings of creditors, which attached the deeds to Kane's home, ZionsER-151–62; and (3) in reply to Kane's opposition to the Conversion Motion, a declaration of its counsel attaching portions of Kane's § 341 creditor meeting transcript. ZionsER-329–47.

Zions filed its Conversion Motion as soon as possible because Kane's hockey season was underway and Zions sought to convert Kane's salary into an estate asset. *See* ZionsER-108–126. The Conversion Motion sought to highlight perceived bad acts by Kane to prejudice the bankruptcy court against his case. *Id.* The Conversion Motion offered scant justification, arguing that the case should be converted because (1) Kane had the ability to pay his creditors based on the salary he was scheduled to earn under his Sharks contract over the next five years, and therefore conversion was in the best interest of creditors; and (2) conversion might ultimately lead to a resolution between Kane and his creditors, and potentially minimize or avoid litigation with creditors over his prepetition conduct, which Zions and other creditors were threatening, and therefore conversion was in Kane's best interest. *Id.*

13

The Conversion Motion then focused on the reasons why a Chapter 11 trustee should be appointed to take over Kane's assets, focusing on Zions' mistrust of Kane's ability to manage his own finances. *Id.*

Professional Bank, South River, Sure Sports, and Lone Shark filed joinders. ZionsER-193–241.

## IV. Kane's Opposition to the Conversion Motion

Kane opposed the Conversion Motion, pointing out his prepetition efforts to resolve matters with the Lenders and correcting the numerous factual misstatements in the Conversion Motion. ZionsER-243–67. Kane also discussed the potential effects of the COVID-19 pandemic on the upcoming season and provided detail and clarity regarding his salary. ZionsER-250–51, 272–73. This detail included an explanation of the deductions from his salary related to COVID-19 and the dramatic difference between his gross salary and his take home pay, *id.*, factors that were not discussed or considered by the Conversion Motion, which counted on presenting Kane's high salary as sufficient to satisfy Zions' burden. *See* ZionsER-108–126.

Kane also pointed out factors which the Conversion Motion glossed over or completely ignored. For example, as the Lenders

14

asserted a security interest in Kane's future salary, if the salary became
a part of the estate, as it would in a Chapter 11 case, there would
undoubtedly be arguments as to the validity and priority of the claimed
security interests. ZionsER-258–59. The notion that the salary would be
available to pay creditors was too simplistic. *Id.* As another example,
Kane pointed out that the creditors were threatening to bring
complaints challenging the dischargeability of their debts or Kane's
ability to discharge any of his debts. *Id.* In a Chapter 11 case, Kane
would be unable to fund a defense of those actions and would be at the
mercy of the Lenders. *Id.* Finally, Kane pointed out the impossibility of
his confirming a plan of reorganization if he were in Chapter 11 and
how the requested conversion could trap him in Chapter 11. ZionsER-
259. Finally, Kane addressed the significant Thirteenth Amendment
issues underlying a conversion to Chapter 11 and the appointment of a
trustee. ZionsER-263–67.

## V.   Hearing on the Conversion Motion

The bankruptcy court held a hearing on the Conversion Motion,
providing the opportunity for any party to present argument. Zions
presented the issue as one of three options: (1) allowing Kane to remain

in Chapter 7 which would lead to a "pittance" to creditors, ZionsER-399, 402; (2) a dismissal of the bankruptcy, which Zions suggested would result in the "piecemeal dismemberment of the debtor," ZionsER-400, 402; or (3) the conversion to Chapter 11 and appointment of a trustee, which Zions hoped would lead the parties to an eventual resolution and divvying up of Kane's future salary, ZionsER-401–02.

Centennial, which is one of the Lenders and holds far and away the largest claim in the case of approximately $8.4 million, appeared at the hearing. It announced that it was opposed to the Conversion Motion. ZionsER-410–14. Centennial argued that conversion was inappropriate and would not result in a benefit to creditors. *Id.* Neither South River nor Professional Bank argued at the hearing. *See* ZionsER-389–424.

## VI. The Bankruptcy Court's Ruling

The bankruptcy court issued a thorough opinion (the "Order") denying the Conversion Motion. ZionsER-361–87. The Order carefully went through the relevant factors for conversion, identifying that the burden was on Zions to establish the factors. *Id.* The Order noted that, if the case was converted, Kane's future salary would be part of a

16

Chapter 11 estate, but it found that there had been no showing of what the result of the inclusion would be. *Id.* It noted the disputes of validity and priority between the Lenders as to Kane's future salary. *Id.* It noted that creditors were likely to bring nondischargeability actions (as two had already done), and the problems such actions created in terms of a plan of reorganization and Kane's ability to defend himself. *Id.* It noted the numerous potential hurdles to confirmation of a plan of reorganization and the future physical risks to Kane and his ability to earn his salary, which would factor into plan feasibility. *Id.* The Order remarked that even on the basic factor of "benefit to creditors," Zions failed to meet its burden to show that conversion would result in such a benefit. *Id.* The Order then discussed the dramatic (and negative) effect conversion would have on Kane. *Id.* Finally, the Order rejected the arguments for appointing a Chapter 11 trustee, and having decided that conversion was not warranted, the bankruptcy court determined that it need not decide the Thirteenth Amendment issues that would otherwise arise. *Id.*

## SUMMARY OF THE ARGUMENT

Kane filed a Chapter 7 bankruptcy in the face of widespread litigation brought by the Lenders. A Chapter 7 case results in the appointment of a Chapter 7 trustee, who has the job of liquidating all of Kane's non-exempt assets and investigating prepetition transactions. In the normal course, a Chapter 7 debtor receives a discharge of his debts. Creditors are free, however, to assert that their specific debts should not be discharged, or to claim that Kane should be denied a discharge of all of his debts. Many creditors took such action in Kane's case.

A Chapter 7 bankruptcy provides that all of Kane's postpetition income is his, and not subject to creditors' claims unless they succeed in obtaining a nondischargeable judgment. The Lenders (other than Lone Shark) created loan documents purporting to take a security interest in Kane's future salary as collateral for their loans, which totaled approximately $15 million. When Kane filed Chapter 7, the Lenders (except for Centennial) rushed to convert his case to a Chapter 11 and appoint a Chapter 11 trustee.

In a Chapter 11 case, the postpetition earning of the individual debtor are part of the bankruptcy estate. Thus, the moving creditors

18

sought to bring Kane's future income into the bankruptcy estate and appoint a trustee to handle the income. The trustee would then effectively pay Kane an allowance and control any reorganization effort. Moreover, with his postpetition income part of the bankruptcy estate and managed by the trustee, Kane would be without the ability to retain counsel to defend himself against the onslaught of nondischargeability litigation from the Lenders and other creditors.

The bankruptcy court considered the potential issues and outcomes in a case converted to Chapter 11. The court further weighed the benefits to the creditors and to Kane if the case were converted. The court's thinking on these matters is thoroughly explained in its opinion. The bankruptcy court can, and did, consider many factors in reaching its decision, including whether the moving parties met their burden of proof on the Conversion Motion. Exercising its broad discretion, the bankruptcy court denied the Conversion Motion. The brief below discusses the bankruptcy court's decision and responds to Zions' arguments seeking to overturn the decision. The arguments are unavailing. Zions obviously disagrees with the bankruptcy court's

ruling, but fails to identify any abuse of discretion, mistake of law, or clear error. As such, the decision below should be affirmed.

## ARGUMENT

## I.   The Bankruptcy Court Properly Denied Conversion to Chapter 11

*A. Legal Standard*

Section 706(b) states, "On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." The burden is on the moving party to show that the case should be converted from Chapter 7 to Chapter 11. *In re Decker*, 535 B.R. 828 (Bankr. D. Alaska 2015); *In re Parvin*, 538 B.R. 96, 101 (Bankr. W.D. Wash. 2016).

Unlike dismissal or conversion under § 707(a)–(b), conversion under § 706(b) is not conditioned on any specific factors or limited to any subset of debtors. *Decker*, 535 B.R. at 834–35. Rather, the decision whether to convert is left in the sound discretion of the court and should be based on what will most inure to the benefit of all parties in interest. *Id.* at 837; *Kearney v. Unsecured Creditors Comm.*, 625 B.R. 83, 90

(B.A.P. 10th Cir. 2021); *In re Schlehuber*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013).

In other words, a bankruptcy court has broad discretion to consider a variety of factors (discussed below) in ruling on a motion to convert and must consider the interests of creditors and the debtor. Unless this court determines that the bankruptcy judge, with his experience and expertise, abused his discretion, this Court should affirm the decision. An abuse of discretion occurs "if [the lower court] applies the wrong legal standard, misapplies the correct legal standard, or if its factual findings are illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Trafficschool.com, Inc. v. Edriver, Inc.*, 663 F.3d 820, 832 (9th Cir. 2011). To the extent the court made any factual determinations in connection with its decision, those are reviewed for clear error.

Courts have considered a variety of factors in determining whether § 706(b) conversion would be appropriate, including (1) the debtor's ability to repay his debts (i.e., from a stable source of future income); (2) the period of time over which the debts were incurred; (3) whether the debtor has made any efforts to repay his debts or negotiate

21

with creditors; (4) whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity; (5) whether the debtor's schedules and statement of current and income reasonably and accurately reflect the debtor's true financial condition, and whether the debtor's expenses could be significantly reduced without depriving the debtor and his dependents of necessities; (6) the likelihood of confirmation of a Chapter 11 plan and whether there exist grounds for immediate dismissal or reconversion; and (7) whether the parties in interest would benefit from conversion. *See, e.g., Decker*, 535 B.R. at 828; *In re Takano*, 771 Fed. App'x 805, 806 (9th Cir. 2019); *In re LaFountaine*, 2016 WL 3344003, at *2-3 (B.A.P. 9th Cir. June 7, 2016); *Gebhardt v. Hardigan (In re Hardigan)*, 517 B.R. 379, 383–84 (S.D. Ga. 2014) (collecting cases); *In re Hardigan*, 490 B.R. 437, 447 (Bankr. S.D. Ga. 2013) (same); *In re Gordon*, 465 B.R. 683, 692–93 (Bankr. N.D. Ga. 2012).

### B. The Bankruptcy Court Properly Analyzed the "Ability to Pay" Factor

The bankruptcy court first analyzed Kane's ability to pay. ZionsER-372–73. While a debtor's ability to pay creditors is an important factor, it alone does not justify conversion under § 706(b).

22

*See, e.g., Hardigan*, 490 B.R. at 448–451; *In re Snyder*, 509 B.R. 945 (Bankr. D.N.M. 2014) (denying motion to convert case of high-earning doctor who had legitimate reasons for declaring bankruptcy); *In re Lobera*, 454 B.R. 824 (Bankr. D.N.M. 2011) (denying conversion despite a debtor's clear ability to pay, absent other factors).[6] As noted in *Hardigan*, consideration of ability to pay is so subjective and value based as to risk lack of equal and uniform treatment of debtors. 490 B.R. at 450.

Zions engaged in, and continues to engage in, a simplistic and limited approach to this question. Essentially, its argument was: (1) Kane has a contract under which he is likely to earn significant sums; (2) in a Chapter 11 those wages are property of the estate; (3) therefore he can pay the creditors and should be required to do so.

As pointed out by Kane in his opposition to the Conversion Motion and as discussed by the bankruptcy court, while it was clear Kane could pay something in a Chapter 11, the amount that could be paid was in

_____

[6] Note that in these cases the discussion regarding ability to pay appears in discussion of § 707 dismissal or conversion, and that discussion is incorporated into consideration of § 706(b) conversion because it was predicated on the same evidence.

question, and appeared much lower than the creditors' rosy predictions.

The Lenders overlooked various deductions from, and uncertainties

about, Kane's salary. Kane's salary was being reduced 30% by an

agreement between the NHL and the players through the collective

bargaining agreement ("CBA"). Kane's salary is also based upon games

played, which is also outside of Kane's control. Kane's salary was

further reduced by various state tax, federal tax, and other incidental

deductions. Kane presented evidence of the effect of these various

deductions at the time of the hearing. With the deductions and

adjustments, Kane's gross pay in his early season paycheck of $213,905

was reduced by approximately 82% to $38,709. ZionsER-273. The

Lenders did not submit any meaningful or convincing evidence as to

what funds might be available for creditors. As the bankruptcy court

held: "Debtor's salary—while objectively significant—may not be as

impactful as Zions asserts. Obviously, converting the case will mean

additional funds for Creditors, but it is not clear just how much."

ZionsER-373.

The bankruptcy court also addressed the significant costs that

would come with the requested appointment of a Chapter 11 trustee,

24

which would be borne by the bankruptcy estate. It remarked on the fact that a trustee would undoubtedly hire professionals (lawyers and financial professionals). The administrative costs would "consume a material portion of a Chapter 11 estate, which seriously undercuts [Zions'] argument regarding Debtor's ability to pay." *Id.* The court made clear that Zions did not address the significant administrative costs if a Chapter 11 trustee were appointed upon conversion. Zions does not substantively address the issue on appeal, except (1) to say that the bankruptcy court should have overlooked the issue and focused on the possibility of plan confirmation and (2) to assume that Kane's salary would cover whatever costs may arise in Chapter 11.

Zions also argues on appeal that the bankruptcy court mistakenly "overlooked" the fact that Zions is unsecured by operation of § 506(a). First, if the bankruptcy court was doing so, apparently Zions also overlooked this fact when it filed its proof of claim on April 13, 2021. ZionsER-426–52. Zions' proof of claims asserts that it is a secured creditor with a claim of $3,740,305.15 and that the amount of the claim

is fully secured.[7] ZionsER-427. Second, creditors in addition to Zions asserted they were secured by Kane's future salary and his contract. ZionsER-194, -196 (Professional Bank's assertion of a security interest in Kane's future income); ZionsER-200 (same for South River); SER-072 (same for Centennial).

### C. The Bankruptcy Court Properly Analyzed the "Possibility of Immediate Reconversion" Factor

The bankruptcy court also considered the possibility of immediate reconversion to Chapter 7. ZionsER-373–74. The policy reason is that conversion to Chapter 11 "would be a futile and wasted act" if immediate reconversion to Chapter 7 is a possibility. *Gordon*, 456 B.R. at 692. Kane's primary concern was that if the case were converted to a Chapter 11, he would be trapped in the case, as § 1112(a)(3) prevents a debtor from seeking to reconvert a case once it has been converted at the request of a creditor. Kane, however, noted that many of the alleged

---

[7] While Zions did not identify Kane's contract or his future salary as being part of the collateral for its claim, the value of the assets identified was less than $50,000 as of the bankruptcy filing. *Compare* ZionsER-427 *to* ZionsER-011–17. Zions could not have listed the claim as fully secured unless it intended to assert a claim against Kane's future salary.

"facts" cited by Zions and the joining parties in support of the
Conversion Motion, could also form the basis to reconvert to a Chapter 7
under § 1112(b)(4)(A) (substantial or continuing loss to or diminution of
the estate and the absence of a reasonable likelihood of rehabilitation),
§ 1112(b)(4)(B) (gross mismanagement of the estate), and other possible
factors under § 1112(b)(4)(E)-(H).

The bankruptcy court found that, if it were to accept the argument
that Kane "cannot be trusted to manage estate property because of his
history of gambling and spending," those same arguments "would apply
with equal force towards reconverting the case" from Chapter 11 to
Chapter 7. ZionsER-373–74. In other words, the alleged
mismanagement would open the door for immediate reconversion.

Zions argues that the court erred by looking to see if grounds for
reconversion existed "in a vacuum." Appellant's Opening Brief at 44.
Zions suggests that the same grounds warranted appointment of a
Chapter 11 trustee, but cites no authority for its proposition. Nor does it
deal with the bankruptcy court's point, that it must consider the
appropriateness of conversion before deciding on whether to appoint a
trustee. In essence, Zions is arguing that the allegations of

27

mismanagement should be ignored in reference to conversion, and only considered *after* conversion is ordered and in reference to the question of whether a trustee should be appointed. By mixing the analysis of trustee appointment with conversion, Zions is "put[ting] the cart before the horse," as warned by the bankruptcy court. ZionsER-374. Of course, there were many reasons to deny the appointment of a trustee, as explained in the court's decision. Zions383–85.

### D. The Bankruptcy Court Properly Analyzed the "Likelihood of Plan Confirmation" Factor

Related to the "ability to pay" question is that of the likelihood of plan confirmation if a case is converted. Creditors only get paid in a Chapter 11 case through a confirmed plan of reorganization. This fact led the court to analyze the issues that would likely arise in a Chapter 11 case with respect to Kane's income and its availability to pay creditors. Zions spends considerable time criticizing and second guessing the bankruptcy court's remarks regarding a potential Chapter 11. It is important to recall that the bankruptcy court was doing its best to anticipate the possible issues that would arise in a converted case. Whether the court was ultimately correct about all the issues, or

whether the Chapter 11 would have unfolded exactly as the court suggested, is not the point. The question is whether the findings are clearly erroneous, or the conclusions constitute an abuse of discretion.

The bankruptcy court considered the possible impact of several creditors asserting nondischargeability complaints against Kane. At the time, two creditors had already filed complaints and the other lenders noted that they intended to do so.[8] Two negative consequences presented themselves as a result of creditors litigating nondischargeable issues. First, Kane's ability to defend against these claims was at issue, as discussed below under in the section on the detrimental effects of a conversion on Kane. Second, dischargeability complaints raised significant question about the confirmability of a plan of reorganization. As noted, a creditor with a nondischargeable judgment (or a potential one) could oppose a plan (whether put forth by

---

[8] Reference to the bankruptcy court docket reveals that five creditors ultimately filed nondischargeability complaints, while Zions still has an extension of time in which to do so. *See* Bankr. ECF 90 (Hope Parker complaint); ECF 91 (Lone Shark complaint); ECF 112 (Professional Bank complaint); ECF 116 (South River complaint); ECF 123 (Centennial complaint); ECF 189 (fifth stipulation to extend deadline for Zions' complaint). This Court may take judicial notice of the bankruptcy court's dockets.

Kane or a Chapter 11 trustee) based upon possible provisions that would restrict or delay the creditor's ability to collect a nondischargeable judgment. Zions' argument that creditors (dischargeable or not) would prefer a Chapter 11 plan over reconversion to Chapter 7 or dismissal are not supported by evidence and are in fact directly contradicted by the largest creditor's (Centennial's) opposition to conversion. ZionsER-410–14.

The court noted the holding of *In re Hamilton*, 803 F. App'x 123 (9th Cir. 2020), and pointed out that the creditors failed to discuss the implications of that ruling. In *Hamilton*, debtors proposed enjoining a creditor with a nondischargeable judgment from interfering with distributions under a plan, thereby delaying and frustrating a creditor's ability to collect. The Ninth Circuit held unless the debtor could prove that all claims would be paid, such a provision was unlawful. *Id.* at 125.

Zions' response to *Hamilton*, and the court's reliance on it, is to cite the dissent in the case. Zions argues that pursuant to § 1141(a)(5)(A), the automatic stay protects the debtor and his estate from any collection efforts. It is difficult to make sense of this argument and Zions makes little effort to explain itself. Confirmation of a plan

30

normally vests all property of the estate in the debtor. § 1141(b). The automatic stay continues until, among other potential occurrences, property is no longer property of the estate. § 362(c)(1). The vesting of estate property in the debtor would terminate the automatic stay, removing the supposed protection that Zions asserts would shield Kane and the estate from piecemeal collection efforts by creditors with nondischargeable judgments.

In addition, the automatic stay terminates upon the closing of the case. § 362(c)(2)(A). When a plan is confirmed, a debtor typically obtains a Final Decree shortly thereafter and the case is closed. *See, e.g.* § 350(a); *In re Johnson*, 402 B.R. 851, 857 (Bankr. N.D. Ind. 2009). Entry of the Final Decree and closing of the case is necessary to stop the accrual of fees to the United States Trustee. *Id.* As such, either because of the operation of § 1141(b) or the closing of the case shortly after confirmation, the automatic stay would not prevent collection efforts by a creditor with a nondischargeable judgment, and a plan could not enjoin that creditor from collection efforts, given the fact that no matter

31

how optimistic creditors might be in Kane's case, they would recover far

less than full payment in a Chapter 11 case.[9]

The court noted that Zions and the Lenders supporting the

Conversion Motion all claimed a security interest in Kane's future

salary. Whether the security interest was valid and which lender might

have priority if the interests were valid, was unknown at the time. The

court's decision discusses the potential ramifications caused by the

anticipated dispute over the validity and priority of security interests in

Kane's future salary. ZionsER-375–76. Tellingly, none of the lenders

offered to waive their security interest or addressed this issue. Instead,

the supporting lenders (led by Zions) made vague references to creditors

needing to resolve disputes as to security interests and priorities if the

case was converted. ZionsER-320. Additionally, as described above,

---

[9] Zions will undoubtedly argue further about these issues and suggest ways around this obvious conundrum. But the argument proves Kane's point. At best, the parties would be arguing in the context of a Chapter 11 about whether a plan of reorganization could enjoin collection efforts of creditors holding nondischargeable judgment. This argument would occur in front of the same judge who has already made clear his opinion that an injunction is improper.

Professional Bank, South River, Zions, and Centennial all claimed security interests in Kane's future income.

The Court also discussed the risks to Kane's ability to continue to earn a high salary, with which he could feasibly fund a Chapter 11 plan. ZionsER-372–73, -75. This discussion, and the concerns expressed, related to the uncertainties of a potential Chapter 11 plan. The bankruptcy court recognized that Kane's "NHL Contract does not necessarily provide compensation to Debtor if he is not fit to play." ZionsER-375. It identified uncertainty in his compensation and was "not convinced a plan so dependent on Debtor continuing to play hockey for several years without interruption has a reasonable probability of success." ZionsER-377.

On appeal, Zions argues that Kane would receive his normal income if he were to sustain physical injuries while playing hockey. Zions argument assumes only two possible futures—Kane can continue to play hockey, or get injured on the ice—and presents this as a solution to creating a feasible plan. However, this argument overlooks all of the other risk and uncertainty associated with the career of a professional athlete. Again, the court's remarks and its contemplation of Kane's

33

profession and income were in the broader context of its weighing relevant factors in ruling on the Conversion Motion, to wit, some of the potential obstacles to confirming a Chapter 11 plan.

The bankruptcy court also raised the issue of the absolute priority rule as another impediment to a potential Chapter 11 case and Kane briefly discusses it here. ZionsER-376–77. The rule provides that unless all classes of unsecured creditors accept a plan of reorganization, the court cannot confirm a plan if the debtor retains any non-exempt property. The one exception to this rule is if the debtor provides "new value". *Zachary v. Cal. Bank & Trust (In re Zachary)*, 811 F.3d 1191, 1194 (9th Cir. 2016). Satisfying the new value exception would be difficult for Kane (or any individual debtor). Kane's salary would not count as new value, as it would already be property of the estate and a proposed contribution of new value must be "present contribution[s], taking place on the effective date of the Plan rather than a future contribution." *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997). The new value must also be "reasonably equivalent to the value or interest received." *Id.* at 654. Kane would be unable to provide

34

any new value and the absolute priority rule would be another unresolvable obstacle to plan confirmation.

Zions argues in its brief that Kane would have close to $700,000 in exempt assets, which he could utilize to generate "new value" to satisfy the absolute priority rule. Appellant's Opening Brief at 34–35. While this amount would likely be completely inadequate in any event, and Zions' estimate of exempt assets was potentially the case at the time Zions filed its Opening Brief, the bankruptcy court has ruled on Zions' objections to Kane's homestead exemptions and reduced Kane's homestead exemption to $170,350.[10] The lower homestead exemption, moreover, is another point against the absolute priority argument asserted by Zions. With a small amount of exempt property to utilize, Kane's ability to satisfy the absolute priority rule necessary to confirm a plan of reorganization is made even more difficult, though it was near impossible to begin with.

_____

[10] Zions argues that Kane acted improperly by allegedly transferring non-exempt property to buy a home for himself and his family and then asserting a homestead exemption. The court found that there was nothing improper in Kane's conduct. For separate reasons, however, the bankruptcy court limited Kane's homestead exemption to $170,350. SER-042–70. Kane recently appealed this decision.

Zions argues that the bankruptcy court should have considered a variety of hypothetical solutions to expected problems to be encountered on the way towards plan confirmation, none of which Zions suggested at the time. Zions argues that Kane could meet various requirements for plan confirmation, and that a plan proponent could even obtain a "cramdown" confirmation over the objections of rejecting creditors. Besides being completely speculative and unsupported by evidence, these arguments ignore the very real problems identified by the bankruptcy court: the issue of dischargeability litigation and collection outside of a confirmed plan, creditors' asserted security interests in Kane's future income, issues of plan feasibility, and the absolute priority rule, among others.

### E. The Bankruptcy Court Properly Analyzed the "Accuracy of Schedules and Statements" Factor

Another factor for the court to consider is whether the debtor's schedules and statement of current income reasonably and accurately reflected the debtor's true financial condition, and whether the debtor's expenses could be significantly reduced without depriving the debtor and his dependents of necessities.

36

The Conversion Motion sought to paint Kane as a dishonest and deceitful individual who "misrepresents the facts and shades the truth." ZionsER-117. Kane responded to this unfounded personal attack, and the court rejected the examples cited by Zions. ZionsER-383–85. Zions does not contest the court's findings on this factor.[11]

### F. The Bankruptcy Court Properly Analyzed the "Benefit to Parties in Interest" Factor

Certainly, one of the important factors for consideration is the benefit to the parties if the case is converted. The court interpreted the case-developed factor of "benefit to all the parties in interest" to include the interests of creditors and debtors. Zions does not challenge this interpretation but argues that the bankruptcy court unfairly or improperly applied the analysis in this case.

With respect to the benefit to the creditors, it is fair to describe the court's conclusion as noting that creditors *could* fair better in a

---

[11] Similarly, Zions does not challenge the court's findings on the factor related to debtor's efforts to repay or negotiate his debts. As noted by Kane and the court, long before filing bankruptcy, Kane retained workout counsel and a CPA turnaround adviser to work with him and his creditors to resolve the situation. The efforts were ultimately unsuccessful. ZionsER-270–71.

Chapter 11, but the extent of that benefit was speculative and subject to many unknowns.[12]

It is worth noting here that Centennial, with a claim approximately twice as large as any other creditor, opposed the Conversion Motion. Centennial argued that conversion was not better for creditors, positing that the case would be administratively expensive, contentious, and would fail in a Chapter 11. ZionsER-410–14. Zions fails to acknowledge the largest creditor's opposition to the Conversion Motion or discuss how this Court should weigh it in analyzing the issue.

Even before it considered the effects of conversion on Kane, the bankruptcy court found that, "[i]n sum, each factor weighs at least somewhat against converting this case." ZionsER-378. Turning now to the effect on Kane of conversion to Chapter 11, conversion would not further his interests or those that depend on him for support.

------

[12] The Chapter 7 Trustee concluded that the Chapter 7 case would likely result in a distribution to creditors, and reference to the bankruptcy case docket indicates the Chapter 7 Trustee is taking steps to liquidate estate assets and recover on behalf of creditors.

Conversion would have trapped Kane in a Chapter 11 case that he did not need and did not want.[13]

As the court noted, Kane's postpetition income would be part of the bankruptcy estate in a converted case, but not part of the estate in Chapter 7. *See* § 1115(a)(2). As such, it was clearly in Kane's interest not to have his future income become part of a Chapter 11 estate. ZionsER-378–80. The right to one's post-petition income is an important benefit of Chapter 7 in return for a debtor relinquishing non-exempt assets. *Id.*

The Conversion Motion relied heavily on a case from a bankruptcy court in Georgia. In *In re Gordon*, 465 B.R. at 683, the court converted the debtor's case to Chapter 11. It found that the debtor was really a pawn between his creditor and current employer, who was paying his legal fees. The case was really a two-party dispute with a relatively modest amount of debt at issue. Moreover, the court found Gordon had significant ability to pay his claims via a Chapter 11 and the case was

---

[13] This is not the case where the debtor is a business trying to reorganize; this is the case of an individual that derives his income from providing personal services. Putting him in Chapter 11 would be to force him to work for his creditors against his will.

39

unlikely to be reconverted from a Chapter 11 given that the creditor did not seek appointment of a Chapter 11 trustee. The court felt it was highly likely the parties would be able to resolve their differences and come to a resolution. In this matter, the bankruptcy court distinguished *Gordon* on several grounds: the amount of debt, uncertainty of repayment, the complexity of the case, the number of creditors and general contentiousness of the case, the request to appoint a Chapter 11 trustee, the potential for reconversion to Chapter 7, and related accusations regarding Kane's pre-petition conduct. In other words, all the facts that made conversion in *Gordon* a potential benefit for the debtor, did not exist in Kane's case. ZionsER-377–79.

The threat of dischargeability litigation in the context of a Chapter 11 was particularly troubling. In a Chapter 11, Kane would be facing multiple dischargeability cases with no ability to defend himself. His salary would be property of a Chapter 11 estate pursuant to § 1115, controlled by a trustee if the court granted the creditors' request to appoint one, and unavailable to pay counsel to defend the adversary proceedings. With a Chapter 7, Kane can utilize his post-petition income for the defense of the five adversary proceedings. Had the case

40

been converted, Kane would be defenseless against efforts seeking to have over $10 million of debt determined to be nondischargeable.

About the best Zions offered as an explanation for the benefits to Kane in a Chapter 11, was that he would be "able to address, in a single forum, the multi-creditor non-dischargeability litigation and other litigation that he will invariably be facing." ZionsER-322. It is difficult to decipher what was meant by this anodyne statement. Because Kane filed bankruptcy, by definition, all the litigation would take place in the bankruptcy court. Converting to Chapter 11 would not change that.

Any suggestion that Kane could have used his future income to defend against the dischargeability litigation during a Chapter 11 is wrong. Moreover, the limitation would not only apply to Kane, but would affect his counsel as well. First, the income would be property of the estate. If a trustee was appointed, as the creditors requested, Kane would be, in effect, on an allowance determined by the Chapter 11 trustee. It is safe to assume a trustee would not allow use of estate property that did not benefit the estate. As there was no dispute that

41

Kane owed the Lenders money, litigation over the dischargeability of their claims would be of no benefit to the bankruptcy estate.[14]

Even if no trustee were appointed upon conversion, creditors would oppose the use of estate funds to defend the dischargeability litigation. Moreover, counsel for Kane would be prohibited from being paid by the estate to defend the claims. Section 330(a)(4)(A)(ii) provides that the court should not allow compensation to debtor's professionals for services that are not "reasonably likely to benefit the debtor's estate; or necessary to the administration of the case." Defending a nondischargeability action benefits the debtor personally and estate funds cannot be used for counsel if the services do not benefit the estate. *In re Reed*, 890 F.2d 104, 105 (8th Cir. 1989); *In re Perez*, 30 F.3d 1209, 1219 (9th Cir. 1994) ("Counsel for the estate must keep firmly in mind that his client is the estate and not the debtor individually . . . . Under no circumstances . . . may the lawyer for a bankruptcy estate pursue a course of action, unless . . . [the action] serves the best interests of the

_____

[14] There may be some minor disputes over the exact amount of the Lenders' claims, but no dispute as to there being a large debt to those Lenders.

estate."); *In re Dixon*, 2010 Bank. LEXIS 3305, 2010 WL 3767604 (Bankr. N.D. Ca. 2010) (denying fees for defense of an objection to debtor's exemption claim).

Moreover, and as discussed above, what would the outcome be if a creditor prevailed on a § 523 nondischargeability claim? How could Kane (or a Chapter 11 trustee) confirm a plan that sought to use postpetition wages for a plan when a portion of the wages were subject to garnishment by a creditor with a nondischargeable claim? The uncertainty about confirmation of a plan of reorganization was another significant detriment to Kane in the event of conversion. Zions argues that Kane would have also benefitted by conversion because he could obtain a "better discharge" through a confirmed plan. First, as discussed above, the obstacles to a confirmed plan were significant, if not unsurmountable. Second, Zions' theory appears to be that a confirmed plan would have "allowed" Kane to pay down his debt to creditors over five years, so that any creditors that obtained nondischargeable judgments would be owed less at the conclusion of the plan payments. This analysis utilizes "creative math." Kane is unquestionably better off not making any payments under a plan, and if

any creditors obtain a nondischargeable judgment, he can deal with them at that point. Moreover, a creditor with a nondischargeable judgment would be limited to a maximum levy of 25% of Kane's available salary, such that Kane would not be subject to "dismemberment" as Zions so graphically suggests.

## II.  The Bankruptcy Court Properly Declined to Appoint a Trustee

The bankruptcy court held that, "even if [it] were to grant conversion as Zions requests, [it] would not appoint a Chapter 11 trustee." ZionsER-383. On appeal, Zions argues that the bankruptcy court based this ruling on erroneous findings. Appellant's Opening Brief at 52. For the reasons set forth below, the bankruptcy court's decision is sound and should be affirmed.

### A. Legal Standards

Pursuant to § 1104(a), a trustee "shall" be appointed in a Chapter 11 case "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case" or "if such appointment is in the interests of creditors . . . and other interests of the

44

estate." § 1104(a)(1)–(2).[15] The appointment of a Chapter 11 trustee is an "exceptional remedy that should not be made lightly." *In re Nautilus of N.M., Inc.*, 83 B.R. 784, 788 (Bankr. D.N.M. 1988). Because "appointing a Trustee is an 'extraordinary' remedy . . . there is a corresponding 'strong presumption' that the debtor should be permitted to remain in possession." *Prologo v. Flagstar Bank, FSB (In re Prologo)*, 471 B.R. 115, 124 (D. Md. 2012) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003)).

The burden of proof is on the movant. *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015). Though the bankruptcy court applied a "preponderance of the evidence" standard, ZionsER-383–84, the standard of proof is unsettled in the Ninth Circuit, leading some bankruptcy courts to apply a "clear and convincing evidence" standard due to the seriousness of the issue. *In re Velde*, No. 18-11651-A-11, 2018 Bankr. LEXIS 2810, at *4 (Bankr. E.D.

---

[15] In each case, appointment of a trustee shall be considered without regard to "the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." § 1104(a)(1)–(2).

Cal. Sep. 12, 2018) (citing *Adams v. Marwil (In re Bayou Group, LLC)*,

564 F.3d 541, 546 (2nd Cir. 2009) and *Official Comm. of Asbestos*

*Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313

(3rd Cir. 2004)).

### B. The Bankruptcy Court Found No Cause to Appoint a Trustee

The bankruptcy court found that Zions had not carried its burden

to prove cause for trustee appointment under § 1104(a)(1) due to fraud

or dishonesty:

> Beginning with fraud or dishonesty, Zions and the joining
> parties first point to the amendments Debtor has made to his
> schedules. It is possible Debtor had dishonest or fraudulent
> motives in omitting information from his schedules. But by
> filing those amendments Debtor shows at least some evidence
> of intent to comply with the Code, which is bolstered by his
> appearance at the § 341(a) meetings and providing the
> Chapter 7 Trustee and U.S. Trustee with documents. Debtor
> also provides at least some explanation for omissions like
> transferring the Rolex watches for a gambling debt. While
> Zions and other parties may not find such explanations
> convincing, this is their motion to prove up, and they have
> given me nothing to show such explanations are false. The
> parties seeking a trustee also vaguely assert irregularities in
> the financial statements he provided in obtaining loans from
> them, but again provide no evidence for such assertions.

ZionsER-384. The bankruptcy court then turned its attention to Zions'

allegation of gross mismanagement:

> Turning to gross mismanagement of the estate, I agree that Debtor's pre-petition financial decisions appear ill-considered. But I also find significant that at some point Debtor appears to have realized the disarray in his financial position and hired outside experts to restructure his affairs. That such efforts proved unsuccessful, resulting in this bankruptcy, is less important than his showing at least some understanding of his mistakes, and the need to correct them. Debtor's compliance with the Code so far shows this diligence may be more than a temporary change. On balance, I find the weight of evidence shows that, even if his prior conduct was gross mismanagement, his recent conduct shows marked improvement. I agree with Debtor that, were this case to be converted to Chapter 11, Debtor has shown he should at least have the opportunity to prosecute it himself.

*Id.* Kane's conduct showing "marked improvement" include (1) Kane's hiring of debt restructuring counsel (Mr. Fiero) and an accountant to negotiate a feasible plan to pay off his debts, ZionsER-270–71;[16] (2) Kane's acknowledgement of, and efforts to recover from, his gambling issues,[17] ZionsER-273; (3) Kane's appearance at multiple § 341

───────────────

[16] Zions argues that Kane's hiring of counsel and a CPA to assist in turnaround negotiations should be ignored because he still suffered large gambling losses after he retained those professionals. Having a problem with gambling, and hiring professionals to assist you, are not mutually exclusive.

[17] "With respect to my gambling, it has been an issue in my past and it would be inaccurate to pretend it has not had a negative effect on my life, financially and otherwise. I have undergone and continue to

meetings of creditors and diligent responses to requests for information and documents from the Chapter 7 trustee and United States Trustee, ZionsER-271–72; and (4) Kane's revisions to his Schedules to ensure the completeness of his disclosures, including to voluntarily disclose the repayment of a debt with the transfer of two Rolex watches, ZionsER-273–74. The Chapter 7 trustee also noted that he had "received very good cooperation from the debtor through this process." ZionsER-419–20.

Having found no cause to appoint a trustee under § 1104(a)(1), the bankruptcy court next analyzed whether appointment would best serve the interests of creditors under § 1104(a)(2). Zions had argued that a trustee should be appointed due to acrimonious, irreconcilable conflicts between Kane and his creditors. ZionsER-384; ZionsER-124 (Zions' argument that "[c]reditors are not going to suddenly find Kane a wonderful steward of millions of dollars just because the case converts to chapter 11."). The bankruptcy court rejected this argument and again found that Zions had not carried its burden:

---

receive personal therapy to deal with it and other matters and hope that the issue is behind me." ZionsER-273.

Zions and the joining parties give no evidence of such a conflict. What conflict they show appears fairly standard to a debtor-creditor relationship that is in default. Also, Debtor's decision to hire restructuring counsel prior to filing this bankruptcy shows an intent to work with his creditors, meaning Debtor recently believed cooperation was still possible. He may still, at least with regard to individual creditors, seeing as his stated reason for filing this case was that it was not possible for him to defend against the numerous creditor actions filed against him in quick succession.

ZionsER-385.

### C. Zions' Arguments Are Unavailing

On appeal, Zions argues that the bankruptcy court's findings were erroneous, at least as they pertain to the "gross mismanagement" element of § 1104(a)(1), because Kane "hired insolvency counsel in October 2019, *before* he incurred $1,500,000.00 in gambling losses." Appellant's Opening Brief at 52. Zions also asserts that Kane borrowed $600–700 thousand during this time to pay down gambling debts and incurred another $750 thousand in debt "based on apparently speculative tax investments."[18] *Id.* at 53.

---

[18] Below, Zions had asserted that this tax investment was "another form of gambling." ZionsER-117. This assertion was vigorously

Zions' argument fails to realize that the bankruptcy court had considered all of these facts and found that, while Kane's past financial decisions were "ill-considered," they were outweighed by Kane's subsequent conduct. ZionsER-384. The bankruptcy court found that Kane's efforts to negotiate with his creditors and to recover from his gambling issues showed "at least some understanding of his mistakes, and the need to correct them." *Id.* It further found that Kane's efforts to comply with his obligations under the Bankruptcy Code showed "this diligence may be more than a temporary change." *Id.* On balance, after considering all of the available evidence, the bankruptcy court properly concluded that, if the case were to be converted to Chapter 11, appointment of a trustee was not warranted under § 1104(a)(1). *Id.*

The bankruptcy court also found that appointment of a trustee was not in the best interests of creditors under § 1104(a)(2). Zions does not challenge this finding on appeal. *See* Appellant's Opening Brief. As such, the bankruptcy court's decision should be affirmed.

---

contested by the lender, which described it as "an investment in tax credits that is estimated to result in a tax refund of $1,800,000.00 to the Debtor. An investment in tax credits can hardly be characterized as gambling." ZionsER-241.

## III. Conversion and Appointment of a Trustee Would Violate the Thirteenth Amendment

Kane argued below that conversion to Chapter 11 and appointment of a trustee would violate the Thirteenth Amendment. Because the court decided not to convert the case for statutory reasons and noted that appointment of a trustee was not justified in any event, the court decided it was unnecessary to decide Kane's Thirteenth Amendment argument. If, however, this Court were to reverse the decision, it (or the bankruptcy court) would then need to confront this issue. Accordingly, Kane reiterates his Thirteenth Amendment position.

### A. Conversion to Chapter 11 Would Violate the Thirteenth Amendment

Although there is no absolute prohibition on the involuntary conversion of an individual's case, courts are sensitive to the issue of involuntary servitude under Chapter 11 (and Chapter 13). 6 Collier on Bankruptcy, ¶ 706.03 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). Even though individuals are eligible to be debtors under Chapter 11, courts have refused to grant motions to convert when the movant's intent was to compel the debtor to submit to an involuntary payment

51

plan. *In re Snyder*, 509 B.R. 945 (Bankr. D.N.M. 2014); *In re Graham*,

21 B.R. 235 (Bankr. N.D. Iowa 1982) ("individual debtors should not be

forced into a repayment plan against their will"); *In re Brophy*, 49 B.R.

483 (Bankr. D. Haw. 1985) (following *Graham* and finding "that Section

706 (b) was not intended to be a vehicle by which individual debtors

would be forced to submit to a plan of repayment against their wills.").

On the subject of mandatory Chapter 13 proceedings, Congress

has stated:

> . . . Chapter 13 is completely voluntary. The Committee [on
> the Judiciary] firmly rejected the idea of a mandatory or
> involuntary Chapter XIII in the 90th Congress. The
> thirteenth amendment prohibits involuntary servitude.
> Though it has never been tested in the wage earner context,
> it has been suggested that a mandatory chapter 13, by forcing
> an individual to work for creditors, would violate this
> prohibition. On policy grounds, it would be unwise to allow
> creditors to force a debtor into a repayment plan. An unwilling
> debtor is less likely to retain his job or to cooperate in the
> repayment plan, and more often than not, the plan would be
> preordained to fail.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 120 (1977) (footnotes omitted).

Prior to the enactment of the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 ("BAPCPA"), there were no similar

issues with Chapter 11. *See Toibb v. Radloff*, 501 U.S. 157, 165–66

(1991) (finding no concerns about involuntary servitude because

52

Chapter 11 did not require a debtor to pay future wages). However, BAPCPA changed this by expanding the Chapter 11 estate to include postpetition personal service income. *In re Lobera*, 454 B.R. 824, 854 n.33 (Bankr. D.N.M. 2011). By allowing creditors to force conversion of a Chapter 7 debtor's case to Chapter 11, coupled with an inability of the debtor to voluntarily reconvert or dismiss and the inclusion of the debtor's postpetition income, Congress created the setting for a constitutional challenge. *Id.*

It is doubtful that Congress intended to subject individual debtors to the possibility of involuntary servitude in light of its misgivings concerning the constitutionality and wisdom of forced repayment plans. *See Graham*, 21 B.R. at 239 n.6. Courts have observed, however, that the "legislative history indicates that Congress was thinking primarily, if not exclusively, of corporate, and not individual, debtors in the context of involuntary Chapter 11 proceedings." *Id.* (internal citations removed). No one can force an individual to be a Chapter 13 debtor against his will, because doing so might violate the Thirteenth Amendment's involuntary servitude prohibition. *Toibb*, 501 U.S. at 165–66; *Lobera*, 454 B.R. at 855; *see* §§ 706 (c) and 1307(a). There are

53

no similar statutory protections for potential individual Chapter 11

debtors, but the constitutional right against involuntary servitude

remains. *Snyder*, 509 B.R. at 955. The policy reasons, as stated by

Congress, also remain. It is better to encourage a debtor to retain his

employment instead of risking that a debtor will walk away from his job

to avoid working to fund a repayment plan that primarily benefits

someone else. *Graham*, 21 B.R. 235 at 238–39. It is also better to avoid

the administrative difficulties in attempting to force a debtor to comply

with a repayment plan that is preordained to fail, instead of enforcing

compliance with Chapter 7. *Id.*

Because conversion to Chapter 11 would make Kane's future

wages property of the bankruptcy estate, and because he would be

forced to work involuntarily for the creditors' benefit without the option

to reconvert or dismiss his case, conversion would violate the

Thirteenth Amendment.

### B. *Appointment of a Chapter 11 Trustee Would Violate the Thirteenth Amendment*

If Kane's case was converted to Chapter 11 and a Chapter 11

trustee appointed, Kane would lose additional rights and freedoms in

addition to those described above. He would be stripped of his ability to (or even to seek permission to) (1) manage his income from his providing personal services; (2) convert or dismiss his case under § 1112(a) and (b)(2); (3) hire professionals under § 327(4) use, sell, or lease property of the estate under § 363; (5) obtain credit under § 364; and (6) accept and reject executory contracts and unexpired leases to which he is a party under § 365. Converting Kane's case to Chapter 11 and appointing a Chapter 11 trustee would depose him of his ability to act as a debtor in possession and subjugate him to the whims of his creditors and the Chapter 11 trustee.

This has caused significant issues when it has arisen. In one case, a trustee was appointed in the case of a voluntary Chapter 11 debtor without consideration of the constitutional issues. *In re Clemente*, 409 B.R. 288 (Bankr. D.N.J. 2009). The case quickly hit a statutory roadblock because the debtor, no longer serving as debtor in possession, lost power to convert his case, lost access to his income, and was caught "between the Charybdis of § 1115 and the Scylla of § 1112." *Id.* at 290. He was required to commit his future earnings to pay back creditors but was unable to retreat from such commitment. *Id.* at 290–91. The Court

noted that the debtor was disqualified from Chapter 13 due to his substantial debts and that he was detained in Chapter 11 until the Chapter 11 trustee decided to move for conversion (which was unlikely) or a plan of reorganization was confirmed (which was also unlikely due to various points of contention). *Id.* at 293. As such, Chapter 11 was his only option and "he would be forced to work for his creditors in breach of his freedoms guaranteed by the Thirteenth Amendment." *Id.* The Court ultimately used its equitable powers to *sua sponte* terminate the Chapter 11 trustee, restoring the debtor to possession and management of the estate, and then immediately converted the case to Chapter 7, thus avoiding the constitutional issues and harmonizing the sections of the Bankruptcy Code. *Id.* at 295. While the *Clemente* court demonstrated great creativity in untying a constitutional knot, the bankruptcy court's denial of Zions' conversion/appointment motion should be denied as to avoid any tangles whatsoever.

Finally, Zions' request to appoint a trustee presents a disturbing hypothetical. It is premised on the assumption that Kane will earn large amounts of income that will become part of the Chapter 11 estate and an eventual plan of reorganization to be administered by a Chapter

56

11 trustee. This is further predicated on the supposition that the

Chapter 11 trustee will assume a pending executory contract between

Kane and the Sharks. While Kane currently intends to continue playing

with the Sharks, the Lenders request that his personal choice be

removed from the equation. A Chapter 11 trustee, if appointed, would

be placed in charge of Kane's life. It creates a risk that the Chapter 11

trustee would seek to assume a personal services contract that Kane

may wish to reject. It would also result in the Chapter 11 trustee

making important decisions about Kane's future employment,

residence, and all of his living expenses. Subjugating Kane, as well as

his family, to the whims of a Chapter 11 trustee not only violates the

Thirteenth Amendment, but it is also an affront to Kane's dignity.

Rather than trap Kane in an inescapable situation, from which it

may later have to free him after having added layers of administrative

expenses, the constitutional problems should simply be avoided by

affirming the bankruptcy court's decision not to convert Kane's case to

Chapter 11 and appoint a trustee.

## CONCLUSION

For the reasons set forth above, Kane requests that the Court affirm the bankruptcy court's denial of Zions' motion to convert his case to Chapter 11 and appoint a trustee.

Date: September 7, 2021                FINESTONE HAYES LLP

                                       *s/Stephen D. Finestone*
                                       Stephen D. Finestone
                                       Ryan A. Witthans
                                       *Attorneys for Appellee,*
                                       EVANDER FRANK KANE

58

## CERTIFICATION OF COMPLIANCE FOR BRIEFS

**No.:**        3:21-cv-03765-WHO

**Debtor:**   Evander Frank Kane

The undersigned certifies that **this brief contains 11,624 words**, excluding the items exempted by Federal Rule of Bankruptcy Procedure 8015(g). This brief complies with the word limit of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i). The type size and typeface comply with Federal Rule of Bankruptcy Procedure 8015(a)(5)(A).

Date: September 7, 2021            FINESTONE HAYES LLP

*s/Stephen D. Finestone*
Stephen D. Finestone
Ryan A. Witthans

*Attorneys for Appellee,*
EVANDER FRANK KANE