No. 3:21-cv-03765-WHO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re EVANDER FRANK KANE,

*Debtor.*

ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust,

*Appellant,*

v.

EVANDER FRANK KANE,

*Appellee.*

On appeal from the United States Bankruptcy Court
Case No. 21-50028-SLJ
Honorable Stephen L. Johnson

———————————————————————

**APPELLANT'S REPLY BRIEF**

———————————————————————

Michael Gerard Fletcher, SBN: 070849
Gerrick M. Warrington, SBN: 294890
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
mfletcher@frandzel.com
gwarrington@frandzel.com

Attorneys for Appellant
ZIONS BANCORPORATION, N.A.,
dba California Bank & Trust

## <u>TABLE OF CONTENTS</u>

Page

I.    Introduction ...................................................................................................6

II.   Discussion ......................................................................................................8

    A.    A De Novo Standard of Review Applies to the Court's
          Conversion Analysis................................................................................8

    B.    Kane Cites the Wrong Standard for Conversion Under Section
          706(b). ...................................................................................................10

    C.    Kane has Waived Arguments that the Bankruptcy Court's
          Errors Were Harmless...........................................................................11

    D.    A Chapter 11 Trustee Could Not Make Unilateral Decisions for
          Kane Under His NHL Contract.............................................................12

    E.    Kane Should be Estopped From Taking Inconsistent Positions
          Concerning Whether Creditors Hold Security Interests in His
          Earnings.................................................................................................13

        1.    Kane is Taking Two Clearly Inconsistent Positions................14

        2.    The Bankruptcy Court Has Accepted Kane's Position,
              Creating a Perception that he is Misleading this Court. ..........15

        3.    Kane Would Derive an Unfair Advantage or Impose an
              Unfair Detriment if Not Estopped. .........................................16

    F.    The Bankruptcy Court Erred When it Presumed that a Security
          Interest Could Attach to Kane's Earnings.............................................17

    G.    Kane Would Not be "Trapped" in Chapter 11 or "Forced to
          Work for His Creditors" if His Case Were Converted.........................17

    H.    Kane's Own Evidence Established a Multimillion Dollar
          Distribution to Creditors Upon Conversion. .......................................19

    I.    The Bankruptcy Court Failed to Correctly Analyze Futility of
          Conversion.............................................................................................22

    J.    The Bankruptcy Court Erred When it Assumed a Hypothetical
          "Straw Man" Plan Scenario for Kane....................................................23

        1.    The Bankruptcy Court Overlooked the Automatic Stay..........23

        2.    It Was Error to Assume that Invalid Liens on Kane's
              Earnings Would Prevent Plan Confirmation. .........................25

3.    It was Error for the Bankruptcy Court to Ignore Obvious Solutions to Uncertainty in Chapter 11 ...................................26

4.    It was Error for the Bankruptcy Court to Assume Kane's Plan Would Violate the Absolute Priority Rule ......................27

K.    The Record Reflects That Kane Would Benefit From Conversion ............................................................................28

L.    Kane Could Obtain Permission to Pay His Non-Dischargeability Defense Costs From Property of the Estate Post-Conversion. .............................................................29

M.    Kane Has Failed to Rehabilitate the Bankruptcy Court's Errors in Denying Appointment of a Chapter 11 Trustee ...........................33

III.   Conclusion .................................................................................34

CERTIFICATE OF COMPLIANCE ..................................................35

# <u>TABLE OF AUTHORITIES</u>

**Case Law**                                                                 **Pages**

*In re Baker*,
   503 B.R. 751 (Bankr. M.D. Fla. 2013) ..........................................................18

*In re Claar Cellars LLC*,
   623 B.R. 578 (Bankr. E.D. Wash. 2021) .......................................................24

*Clem v. Lomeli*,
   566 F.3d 1177 (9th Cir. 2009).......................................................................11

*In re Clemente*,
   409 B.R. 288 (Bankr. D.N.J. 2009) ...............................................................18

*In re Decker*,
   535 B.R. 828 (Bankr. D. Alaska), *aff'd sub nom. Decker v. Off. of
   the United States Tr.*, 548 B.R. 813 (D. Alaska 2015) ....................... 10, 20, 22

*In re Degross*,
   272 B.R. 309 (Bankr. M.D. Fla. 2001) ..........................................................10

*In re Hamilton*,
   803 F. App'x 123 (9th Cir. 2020)...................................................................24

*Hamilton v. State Farm Fire & Cas. Co.*,
   270 F.3d 778 (9th Cir. 2001)..........................................................................13

*In re Hardigan*,
   490 B.R. 437 (Bankr. S.D. Ga. 2013) ............................................................21

*In re Juarez*,
   603 B.R. 610 (B.A.P. 9th Cir. 2019), *aff'd*, 836 F. App'x 557
   (9th Cir. 2020) ................................................................................................18

*Leach v. U.S. (In re Leach)*,
   130 B.R. 855 (B.A.P. 9th 1991) .....................................................................18

*In re Mendez*,
   464 B.R. 63 (Bankr. D. Mass. 2011) ..............................................................24

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .................................................................... 13, 14

*In re Sarkis Invs. Co., LLC*,
  2019 WL 9243005 (Bankr. C.D. Cal. 2019) .................................. 31

*In re Schupbach Invs., LLC*,
  521 B.R. 449 (B.A.P. 10th Cir. 2014), *aff'd sub nom. In re
  Schupbach Invs., L.L.C.*, 808 F.3d 1215 (10th Cir. 2015) .............. 30

*U.S. Bank Nat. Ass'n ex rel. v. Vill. at Lakeridge, LLC*,
  138 S. Ct. 960 (2018) .................................................................... 8

## Statutes

11 U.S.C. § 326(a) ............................................................................ 21

11 U.S.C. § 330(a) ....................................................................... 30, 32

11 U.S.C. § 330(a)(4)(A)(ii) ..............................................29, 30, 31, 32

11 U.S.C. § 365(c)(1) .................................................................. 12, 19

11 U.S.C. § 552(a) ............................................................................ 15

11 U.S.C. § 706(b) ..................................................................... *passim*

11 U.S.C. § 1105 ............................................................................... 18

11 U.S.C. § 1106(a)(3) ..................................................................... 32

11 U.S.C. § 1112(b) .................................................................... 18, 22

11 U.S.C. § 1115(a) .................................................................... 18, 31

11 U.S.C. § 1127(e) ........................................................................ 26

11 U.S.C. § 1141(d)(5)(B) ............................................................... 26

## Constitutional Provisions

U.S. Const. amend. XIII ................................................................... 18

Appellant Zions Bancorporation, N.A. ("Zions") submits this reply brief in support of its Opening Brief ("Opening Brief") (Dkt. 5) and in response to, and tracking the structure of, the Responsive Brief ("Responsive Brief") (Dkt. 8) filed by Appellee Evander Frank Kane ("Kane").

## I.    Introduction

Kane is entitled to $29 million in earnings under his NHL Contract over the next five years.  If his case were converted to chapter 11, his earnings would become property of the bankruptcy estate.  And, he could pay down potentially tens of millions of dollars in putatively non-dischargeable debt over five years while being protected from collection activity by the automatic stay.  But, if his case remains in chapter 7, his creditors will receive nothing.  And, his non-dischargeable debt will be free to execute against his assets as soon as the case closes—the proverbial "rush to the courthouse."

And, conversion coupled with the appointment of a trustee would provide accountability and prevent potentially catastrophic losses to the estate.  Indeed, Kane admits he has a gambling addiction, which has caused $1.5 million in gambling losses in the year before he filed bankruptcy.  These gambling losses were incurred while Kane was significantly insolvent and being sued by numerous creditors—after he hired insolvency counsel and professionals to reorganize his debt.

Section 706(b) of the Bankruptcy Code provides that the court "may" convert a chapter 7 case to chapter 11. Case law has supplied four factors governing this analysis. The decision is also guided by the overarching goals of bankruptcy. Those goals include avoiding windfalls from the happenstance of bankruptcy, maximization of distributions to the estate, providing the debtor with the protections of the automatic stay and a fresh start (discharge), and avoiding a "rush to the courthouse." Each one of these factors supports conversion.

The bankruptcy court analyzed section 706(b) by using a "straw man" approach to reject Zions' conversion motion. The bankruptcy court also used incorrect or inapplicable rules and unfounded assumptions. At times, the bankruptcy court misapplied rules or overlooked key Bankruptcy Code provisions, which directly addressed the court's analysis. These legal errors were prejudicial. And, the bankruptcy court's conversion analysis was itself predominantly a legal endeavor, not a factual one. None of the conversion facts or evidence were disputed. Zions used Kane's own testimony and evidence to support conversion, even under that "worst case" scenario. This Court's review of the section 706(b) conversion factors is, therefore, de novo.

The Court should reverse and remand with instructions to convert this case to chapter 11 and appoint a trustee. Alternatively, the Court should remand for the bankruptcy court to apply the correct legal standards to its conversion analysis.

II.   **Discussion**

As set forth below, Zions will address the standard of review and each of the issues raised by Kane in his Responsive Brief (as well as issues not raised).

A.   **A De Novo Standard of Review Applies to the Court's Conversion Analysis.**

"[T]he standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018). A mixed question entails primarily legal work when it "involves developing auxiliary legal principles of use in other cases." *Id*. By contrast, a mixed question entails primarily factual work when it requires the trial court to "immerse [itself] in case-specific factual issues—compelling [it] to marshal and weigh evidence, make credibility judgments, and otherwise address … 'multifarious, fleeting, special, narrow facts that utterly resist generalization'…." *Id*. A mixed question entailing primarily legal work is reviewed de novo, whereas a mixed question entailing primarily factual work is reviewed for clear error. *Id*. Legal errors are reviewed de novo. *Id*. at n. 7.

Here, the issue of conversion under section 706(b) is "about as [legal] sounding as any mixed question gets" and its resolution depends on the law and not the undisputed facts. *Id*. at 968. Kane asserts that the bankruptcy court's decision not to convert this case under section 706(b) entailed primarily factual

work because the bankruptcy court considered "a raft of case-specific facts." RB at 7. But, the amount or magnitude of facts is not relevant to whether legal or factual issues predominate. None of the conversion facts or evidence were disputed, and the bankruptcy court's decision to convert was a predominantly legal endeavor involving interpretation of section 706(b) and application of established factors. In applying these factors, the bankruptcy court made findings based on hypothetical scenarios (e.g., whether certain or "all parties" might benefit from conversion, what rules would govern upon conversion, whether the stay would apply, etc.).

The conversion analysis did not require the bankruptcy court to immerse itself in case-specific factual issues, marshal or weigh evidence, make credibility judgments, or otherwise address "multifarious, fleeting, special, narrow facts that utterly resist generalization." To the contrary, there were simply no factual disputes as to historical facts governing the conversion aspects of this case. No credibility determinations or weighing of conflicting evidence was required or requested. No evidentiary hearing was requested. Indeed, Zions used Kane's own testimony at his meeting of creditors and evidence presented *by Kane* in connection with the Motion to Convert. None of this evidence was disputed. Accordingly, the bankruptcy court's sole function was to determine whether the legal standard for conversion was met based on the undisputed evidence before it.

Accordingly, the bankruptcy court's decision to deny conversion was predominately a legal one, subject to de novo review.

**B.      Kane Cites the Wrong Standard for Conversion Under Section 706(b).**

The factors courts analyze under section 706(b) are as follows:  (1) the debtor's ability to pay, (2) the likelihood of confirmation of a chapter 11 plan, (3) the absence of grounds for immediate reconversion, (4) whether the parties in interest would benefit from conversion.  *In re Decker*, 535 B.R. 828, 840 (Bankr. D. Alaska), *aff'd sub nom. Decker v. Off. of the United States Tr.*, 548 B.R. 813 (D. Alaska 2015).  *See also* OB at ¶ V pp. 23–24.

Kane asserts that the Court should consider the following other factors:

(2) the period of time over which the debts were incurred; (3) whether the debtor has made any efforts to repay his debts or negotiate with creditors; (4) whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity; (5) whether the debtor's schedules and statement of current and [sic] income reasonably and accurately reflect the debtor's true financial condition….

RB at 21-22 (citing numerous cases).

But none of these cases apply the above factors to a section 706(b) conversion.  Kane is conflating the standard for conversion under section 706(b) with dismissal for "abuse" under section *707(b)*.  *Cf. In re Degross*, 272 B.R. 309, 313 (Bankr. M.D. Fla. 2001) (analyzing these "other factors" under section 707(b)).  None of the factors are relevant to conversion from chapter 7 to 11, and

no explanation is provided by Kane as to why they should be added to the analysis. Kane's assertion that the Bankruptcy Court "properly analyzed the 'accuracy of schedules and statements' factor" is inaccurate. In support of this assertion, Kane mis-cites the bankruptcy court's analysis of whether to appoint a trustee, not whether to convert. *Compare* RB at ¶ E, pp. 37–37 *with* ZionsER-383–85.

The Court should reject Kane's invocation of these purported additional section 706(b) factors.

### C.   Kane has Waived Arguments that the Bankruptcy Court's Errors Were Harmless.

Where an appellee fails to address an issue on appeal in its answering brief, the appellee waives the argument that the error identified by that issue was harmless. *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (citations omitted).

Here, Zions' analyzed in its Opening Brief no less than 17 discrete legal issues and errors by the bankruptcy court. *See* OB at 3–5. Each one of these issues was important and material to the bankruptcy court's decision not to convert the case or not to appoint a chapter 11 trustee. Each error was prejudicial. As analyzed below, Kane has waived any argument that these errors were not prejudicial.

### D.     A Chapter 11 Trustee Could Not Make Unilateral Decisions for Kane Under His NHL Contract.

The bankruptcy court found that upon conversion and appointment of a chapter 11 trustee, the trustee would be able to unilaterally exercise certain rights under Kane's NHL Contract, including (a) choosing which three teams Kane would be forced to play on if he were traded, and (b) deciding whether Kane is "fit and in proper condition" to play hockey. *See* ZionsER-379 lines 26-28.

These findings were erroneous and based upon the wrong legal standard. Indeed, the bankruptcy court overlooked[1] section 365(c)(1), which prevents a trustee from assuming a contract for personal services *unless all parties, including Kane, consent*. *See* ZionsER-327 lines 4–9.

Notably, *Kane* has never briefed this issue, and has in fact conceded in his schedules (ZionsER-042) and in his Responsive Brief (RB at 57, n. 13) that his NHL Contract is, in fact, a personal services contract. Kane has waived any argument that this legal error was not prejudicial. *See supra* at ¶ II.C.

---

[1] The bankruptcy court overlooked Zions' section 365(c)(1) argument entirely. That analysis was set forth in Zions' reply in support of conversion which the bankruptcy court incorrectly stated "largely reiterates arguments [Zions] made in the original motion." ZionsER-369. Not so. The bankruptcy court missed this briefing and incorrectly stated that this issue was *not* briefed. ZionsER-380. Indeed, *Kane* did not brief this issue, but *Zions* did. *See* ZionsER-326–27.

And, the bankruptcy court specifically identified this issue as being critical to its decision to deny Zions' Motion to Convert. *See* ZionsER-379 line 28–380 line 2 (reflecting the bankruptcy court's emphasis: "It is no exaggeration to say that granting the motion would impinge very significantly on some of the most central choices in Debtor's life.").

The bankruptcy court applied the wrong legal standard, which constitutes reversible error.

### E. Kane Should be Estopped From Taking Inconsistent Positions Concerning Whether Creditors Hold Security Interests in His Earnings.

"[J]udicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). Judicial estoppel protects the integrity of the judicial process by preventing parties from "playing fast and loose with the courts" to gain an unfair advantage. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (citation omitted). Three factors govern the court's application of judicial estoppel—(1) a party must take two inconsistent positions before two courts; (2) the court must have been persuaded to accept the party's earlier position, creating the perception that either the first or the second court was misled; and (3) the party asserting an inconsistent position would derive an unfair advantage or

impose an unfair detriment on the opposing party if not estopped.  *New Hampshire v. Maine*, 532 U.S. at 743 (citations and quotations omitted).

Here, each factor is met.

### 1.    Kane is Taking Two Clearly Inconsistent Positions.

Kane is taking the position that certain creditors—including Zions—hold valid security interests in his earnings.  *See* RB at 22–26 (analyzing Kane's "ability to pay" and injecting references to purported security interests of Zions, Professional Bank, and South River Capital in Kane's earnings); RB at 26 (characterizing Zions' proof of claim as a fully secured claim against Kane's earnings and his NHL Contract);[2] RB at 14–15, 36–37 (asserting that alleged security interests in Kane's earnings might cause litigation over the validity and priority of those liens which might imperil plan confirmation); RB at 16, 30, 33, 38 (pointing to Centennial Bank as a holdout creditor who opposed Zions' Motion to Convert because of its claimed security interest in Kane's earnings).

By contrast, Kane has recently argued to the bankruptcy court that a claimed security interest in his earnings should be dismissed because such a claim is "legally-spurious" (RJN-008 line 8), contrary to Supreme Court legal precedent

---

[2] Zions has never claimed any security interest in Kane's earnings or "his contract."  Kane's characterization of Zions' proof of claim (in footnote 7 of his Responsive Brief) is unfounded.

(RJN-014 ¶ B), "unlawful" (RJN-015 line 11), contrary to the Bankruptcy Code (RJN-015 lines 11-12), "legally unsound" (RJN-047 line 19), "not valid" (RJN-049 n. 3 line 28), and "not legally cognizable" (RJN-050 lines 7-8). Kane has also asserted that "any claimed security interest in future income is invalid." RJN-038 n. 9 (citing 11 U.S.C. § 552(a); *Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330 (B.A.P. 9th Cir. 2004); *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934)).

These two positions are clearly inconsistent.

### 2.   The Bankruptcy Court Has Accepted Kane's Position, Creating a Perception that he is Misleading this Court.

Kane has convinced the bankruptcy court that a creditor may not validly hold a perfected lien against Kane's earnings. Specifically, on July 8, 2021, the bankruptcy court granted Kane's motion to dismiss under Rule 12(b)(6), dismissing a creditor's purported lien claim without leave to amend (RJN-074 lines 17–20) and finding that "§ 552(a) prohibits its prepetition security interest in Defendant's salary from reaching post-petition salary payments" (RJN-075 lines 1-2; *see also* RJN-068–71). On September 21, 2021, Kane argued to the bankruptcy court that this issue is now precluded from re-litigation by the "law of the case" doctrine. RJN-106 at lines 7–9 ("The Court already decided that the purported security interest in Kane's future income is unlawful, and that decision carries over to the Court's determination on the instant Motion.").

If this Court accepts Kane's arguments, it would create the perception that either the bankruptcy court or this Court is being misled by Kane.

### 3. Kane Would Derive an Unfair Advantage or Impose an Unfair Detriment if Not Estopped.

Unless Kane is estopped, he would gain an unfair advantage and impose an unfair detriment on Zions. One of the central issues in this appeal is whether the bankruptcy court correctly assumed the existence of liens on Kane's earnings and that these purported liens might prevent plan confirmation. OB ¶ V.B.5. At the time, the bankruptcy court assumed that such liens *would* prevent plan confirmation. Kane has not disclosed the bankruptcy court's contrary ruling to this Court, although it bears directly on this issue on appeal (including whether the issue is now moot, a potential jurisdictional consideration for this Court). Moreover, Kane asserts that *Zions* has a fully secured lien against Kane's earnings. *See* RB at 25–26, n. 7. This assertion is false. Kane is deriving an unfair advantage in this appeal by taking these contradictory and misleading positions.

Kane should be estopped from asserting in his Responsive Brief that alleged security interests in Kane's earnings are valid. None of these purported liens are valid as a matter of law.

### F.   The Bankruptcy Court Erred When it Presumed that a Security Interest Could Attach to Kane's Earnings.

The bankruptcy court found, as a "legal issue," that Kane's earnings were "not, *at this stage*, free of encumbrance" and that the alleged existence of these liens would "imperil[] confirmation of a plan." ZionsER-375 lines 15, 25 (emphasis added); ZionsER-375 line 15. The bankruptcy court assumed that Kane's earnings were subject to valid liens, which would imperil plan confirmation. *See* ZionsER-375 line 25. But, the bankruptcy court refused to decide that issue "at this stage." ZionsER-375 line 15, 20. The bankruptcy court has now fully analyzed and decided this issue, dismissing such a lien claim without leave to amend. RJN-075 lines 1-2. The bankruptcy court's prior assumption that such liens were valid constitutes legal error, which this Court reviews de novo.

### G.   Kane Would Not be "Trapped" in Chapter 11 or "Forced to Work for His Creditors" if His Case Were Converted.

Kane asserts that conversion to chapter 11 would trap him in a case he "did not need and did not want," and that he would be forced to "work for his creditors against his will." RB at 39, n. 13. *See also* RB at 26.

Conversion would not "trap" Kane in chapter 11 or impose a debt peonage structure upon him. Upon conversion, Kane's earnings would become property of the estate, and he could commit his projected disposable income toward a plan of reorganization which dealt with significant amounts of non-dischargeable debt.

*See* 11 U.S.C. § 1115(a); *In re Juarez*, 603 B.R. 610, 627 (B.A.P. 9th Cir. 2019), *aff'd*, 836 F. App'x 557 (9th Cir. 2020).  If that failed, Kane could seek voluntary dismissal of the case at any time.  *See In re Baker*, 503 B.R. 751, 759 (Bankr. M.D. Fla. 2013) (citation omitted).  *See also* 11 U.S.C. § 1112(b).  True, Kane has no absolute right to dismiss a chapter 11 case.  But, he likewise has no absolute right to dismiss his chapter 7 case.  *See Leach v. U.S. (In re Leach)*, 130 B.R. 855, 857 (B.A.P. 9th 1991).  And, if Kane wanted to remove the trustee and stay in chapter 11, he could do that too.  *See* 11 U.S.C. § 1105.  *See also In re Clemente*, 409 B.R. 288 (Bankr. D.N.J. 2009).

Kane asserts that conversion would violate the Thirteenth Amendment to the United States Constitution by "subjugat[ing] [Kane] to the whims of his creditors and the Chapter 11 trustee" and stripping him of his ability to manage his income, hire estate professionals, use, sell, or lease property of the estate, obtain credit, and accept or reject executory contracts or unexpired leases.  RB at 54–55.  *See also* RB at 57 (reflecting Kane's assertion that a trustee could make unilateral decisions for him under his NHL Contract).

These arguments are specious.  Appointment of a trustee would provide oversight and accountability to Kane, who has an admitted gambling addiction which caused him to incur $1.5 million in losses in the year leading up to his bankruptcy filing.  And, Kane would not be forced to do anything.  If a trustee

were appointed, Kane could still seek approval of a budget providing for his reasonable monthly expenses. Nothing would prevent Kane from seeking permission either through the trustee and/or from the bankruptcy court directly (if no trustee were appointed) to use property of the estate either inside or outside the ordinary course of business or to obtain credit. And, again, a trustee could not make any unilateral decisions for Kane under his NHL Contract. *See* 11 U.S.C. § 365(c)(1). And, importantly, Kane's assertion that he would be "trapped" in chapter 11 paints a false narrative, which ignores the benefits of chapter 11 to Kane. *See infra* ¶ II.K. (discussing benefits to Kane from conversion). Kane's arguments are founded on erroneous legal assumptions.

The Court should reject these arguments.

## H.   Kane's Own Evidence Established a Multimillion Dollar Distribution to Creditors Upon Conversion.

Kane asserts that the evidence of his ability to pay creditors was not "meaningful or convincing" and that Zions overlooked deductions and uncertainties about his earning ability and instead relied on "rosy predictions" about his ability to pay. RB at 24.

To the contrary, Zions used only Kane's own testimony and evidence, none of which was disputed. This evidence included Kane's own testimony concerning his pandemic paycheck and deductions and deferrals under his collective bargaining agreement. ZionsER-272–73 ¶¶ 15–18. Zions accepted, for the sake of

argument, Kane's own "worst case" scenario. This scenario assumed all benefits of the doubt in favor of Kane, including his claimed $93,000.00 per month in regular household expenses. ZionsER-045. This also assumed his earnings deferrals would never be paid back. OB at ¶ V.A. Zions assumed that Kane's earnings during the 2020 pandemic would carry forward for five years. *Id.* And, after these extraordinary assumptions, the evidence in the record *still* reflects in a multimillion dollar *net* distribution to unsecured creditors. *Id*.

Next, Kane asserts that "while it was clear Kane could pay something in a Chapter 11, the amount that could be paid was in question…." RB at 23–24. And, Kane echoes the bankruptcy court's finding that conversion would mean "additional funds for Creditors, but it is not clear just how much." RB at 24 (quoting ZionsER-373 lines 12–13). But, the "ability to pay" factor does not require a bankruptcy court to pinpoint precisely "just how much" a debtor can pay. Rather, the bankruptcy court may (and should) consider a range of available payouts. *See In re Decker*, 535 B.R. at 839–40 (finding it unnecessary to determine exactly how much disposable income would be available and using an upper and lower range of calculations). Here, the record amply reflected Kane's ability to pay a range of multimillions of dollars to his creditors (i.e., between $3.3–4.5 million at least). The bankruptcy court erred by overlooking Kane's own

"worst case" evidence and by assuming it must pinpoint "just how much" Kane could pay.

Kane also asserts that "consideration of ability to pay is so subject and value based as to risk lack of equal and uniform treatment of debtors." RB at 23. In support of this assertion, Kane cites *In re Hardigan*, 490 B.R. 437, 450 (Bankr. S.D. Ga. 2013). But, *Hardigan*'s analysis of "subjectivity" versus "objectivity" in determining a debtor's ability to pay was in the context of determining whether to convert or dismiss a case *under section 707(b)*, not whether to convert under section 706(b). Again, these two standards are materially different. *See supra* at ¶ II.B.

Also, Kane discusses administrative costs. But, administrative costs alone do not prevent confirmation of a plan. And, Kane does not explain how the case would become administratively insolvent. *See* RB at 25. The bankruptcy court also erred by assuming that the case would become administratively insolvent without any evidence to support that finding. *See* ZionsER-373 lines 14–20. In chapter 11, a trustee's compensation is based on a sliding scale of funds actually distributed to creditors. 11 U.S.C. § 326(a). And, even after payment of chapter 11 trustee administrative expenses, Kane's own "worst case" scenario results in a $3.1 million distribution to unsecured creditors. *See* OP at 29. Likewise, chapter 11 professionals are compensated only if they demonstrate that

their services were reasonably likely to benefit the estate.  *See* 11 U.S.C. § 330(a).
Kane fails to address these arguments and has waived any arguments that these
errors were not prejudicial.

### I.      The Bankruptcy Court Failed to Correctly Analyze Futility of Conversion.

Under section 706(b), bankruptcy courts analyze "whether there was cause
for the immediate dismissal or reconversion of the case under § 1112(b) that would
render conversion to chapter 11 a 'futile and wasted act.'" *In re Decker*, 535 B.R.
at 840.

Here, the bankruptcy court found that it was not relevant whether a party in
interest would actually seek to reconvert the case to chapter 7, but rather "what
matters is that they could, so the inquiry turns to whether the record shows grounds
for reconversion." ZionsER-374 at n. 7.  This was legal error, as the standard
requires the bankruptcy court to consider whether conversion to chapter 11 would
be rendered futile.  Conversion would not be futile because grounds for
appointment of a trustee exist.

Kane asserts that Zions is "mixing the analysis," and points to the
bankruptcy court's finding that "it must consider the appropriateness of conversion
before deciding on whether to appoint a trustee."  RB at 27, 28.  No legal authority
is cited to support this assertion (other than the bankruptcy court's ruling).  This
assertion is erroneous.  The bankruptcy court in this matter erred under *Decker* by

failing to consider whether conversion would be rendered futile if a trustee were

appointed post-conversion. This was legal error.

### J.     The Bankruptcy Court Erred When it Assumed a Hypothetical "Straw Man" Plan Scenario for Kane.

Zions briefed several legal errors committed by the bankruptcy court in

connection with its "straw man" plan hypothetical. In response, Kane asserts that:

> the bankruptcy court was doing its best to anticipate the possible issues that would arise in a converted case. Whether the court was ultimately correct about all the issues or whether the Chapter 11 would have unfolded exactly as the court suggested, is not the point.

RB at 28–29.

As analyzed below, however, the bankruptcy court committed numerous

legal errors in its hypothetical plan analysis.

### 1.     The Bankruptcy Court Overlooked the Automatic Stay.

The bankruptcy court incorrectly found that upon conversion, "nothing in

the code" would prevent creditors holding non-dischargeable judgments from

collecting from Kane during his plan. ZionsER-377, lines 11–13. The bankruptcy

court overlooked the automatic stay, which may continue for the duration of an

individual chapter 11 debtor's five-year plan. The stay prevents dischargeable and

non-dischargeable creditors alike from engaging in collection activity against the

debtor or the estate. The bankruptcy court committed reversible error when it

overlooked the automatic stay.

Kane cites *In re Hamilton*, 803 F. App'x 123 (9th Cir. 2020), an unpublished Ninth Circuit memorandum which the bankruptcy court also cited to support its decision to deny conversion.  But, *Hamilton* dealt with an impermissible plan injunction against non-dischargeable judgment creditors; it did not address the applicability of the automatic stay.  *See, e.g.*, *In re Claar Cellars LLC*, 623 B.R. 578, 594 (Bankr. E.D. Wash. 2021) (analyzing *Hamilton* in the context of whether an alleged plan injunction was appropriate).  Kane asserts that "vesting of estate property in the debtor would terminate the automatic stay." RB at 31.  But, Kane fails to address the key proviso in section 1141(b)—property revests *unless* the plan or confirmation order provide otherwise.  Kane's own plan could delay revesting until discharge to avoid this issue entirely.  This is another "straw man."

Kane also asserts that because the stay terminates upon closing of the case, the automatic stay would be terminated if he, himself, sought to close the case.  RB at 31.  But, nothing would require Kane to seek to close his own case.  And, even if Kane did want to close his case, nothing would prevent him from seeking an order permitting only "administrative closure" and preserving the automatic stay for the duration of his chapter 11 plan. *See In re Mendez*, 464 B.R. 63, 65–66 (Bankr. D. Mass. 2011).  This "straw man" approach is inherently limited.

The bankruptcy court's finding that "nothing in the code" would prevent creditors holding non-dischargeable judgments from collecting from Kane during his plan ignores the automatic stay and constitutes reversible legal error.

### 2. It Was Error to Assume that Invalid Liens on Kane's Earnings Would Prevent Plan Confirmation.

Kane asserts that "Tellingly, none of the lenders offered to waive their security interest or addressed [the issue concerning disputes over the validity and priority of security interests in Kane's future salary]." RB at 32. Also, Kane asserts that "the supporting lenders (led by Zions) made vague references to creditors needing to resolve disputes as to security interests and priorities if the case was converted." RB at 32 (citing ZionsER-320). These arguments are meritless.

First, these "priority fights" arguments were *Kane's* arguments in opposition to conversion, not Zions' arguments. *See* ZionsER-258 lines 5-6 (reflecting Kane's argument in opposition to conversion that "Upon conversion will they [sic] fight over which creditor has priority to the alleged collateral (i.e., Kane's salary).")." And, this purported barrier to confirmation is specious. There can be no "priority fights" where no liens exist in the first place. *See supra* at ¶¶ II.E, F. (Notably, Centennial Bank's sole reason for opposing conversion was its purported security interest in Kane's earnings, which lien is invalid as a matter of law.) The

Court should reject Kane's arguments. Simply put, the bankruptcy court erred by assuming any purported liens on Kane's earnings would prevent confirmation.

### 3. It was Error for the Bankruptcy Court to Ignore Obvious Solutions to Uncertainty in Chapter 11.

Kane asserts that a chapter 11 plan viability would be dependent on Kane continuing to play hockey for several years without interruption. *See* RB at 33 (quoting ZionsER-377). The bankruptcy court construed Kane's NHL Contract as requiring him to play hockey without interruption in order to receive full salary. This was legal error. Kane's HNL Contract provides for his full salary and signing bonuses through league year 2025 even if he sustained physical injuries while playing hockey or hockey-related travel. ZionsER-133 (NHL Contract at ¶ 5.(d)). Kane does not address this contractual provision. Instead, Kane pivots to "all of the other risk and uncertainty associated with the career of a professional athlete." RB at 33.

But, Kane fails to address the mechanisms which account for such uncertainty in chapter 11—i.e., early discharge and plan modification. 11 U.S.C. §§ 1141(d)(5)(B), 1127(e). The bankruptcy court also failed to consider these Bankruptcy Code provisions when it found that Kane could only receive a chapter 11 discharge "if a plan is confirmed and then only if payments are complete," which the court found could "take years" to complete. ZionsER-380

lines 13-16.  The bankruptcy court overlooked early discharge and plan modification.  These are reversible errors.

### 4.     It was Error for the Bankruptcy Court to Assume Kane's Plan Would Violate the Absolute Priority Rule.

Kane points to the absolute priority rule and asserts that because his homestead exemption has now been reduced to $170,350.00,[3] insufficient "new value" would exist for Kane to keep his Residence in chapter 11.  RB at 35.  Kane then concludes that plan confirmation is jeopardized.  RB at 35.  Not so.

Kane has provided no authority that the "ability to confirm a plan" factor requires a debtor to keep nonexempt assets notwithstanding the absolute priority rule.  No such authority exists.  Indeed, Kane may not keep all three of his multimillion dollar mansions in chapter 11 *or in chapter 7* unless he can properly invoke exemptions.  Importantly, if Kane cannot fund a plan with "new value" contributions from independent sources (e.g., exempt property, friends, family, and/or funding from third parties), then the Bankruptcy Code does not permit him to keep that property unless he pays impaired unsecured classes of creditors in full.

---

[3] Kane included this homestead order in his "supplemental excerpts of record."  But, this order was not part of the record on appeal.  It was entered only after Zions filed its Opening Brief.  Kane's use of this order in his Responsive Brief is inherently prejudicial to Zions.  Zions objects to the SER's inclusion of the homestead order for these reasons.

The relevant conversion factor focuses on Kane's ability to confirm a plan. The absolute priority rule does not prevent Kane from confirming a plan. The Court should reject Kane's argument.

In sum, none of Kane's alleged barriers to confirmation are tenable.

### K.   The Record Reflects That Kane Would Benefit From Conversion.

Kane asserts that the benefits of conversion were "speculative and subject to many unknowns." RB at 38. One "unknown" identified by Kane is Centennial's purported security interest in Kane's earnings. This argument fails as a matter of law. *See supra* at ¶ II.E.F. Kane also asserts that the bankruptcy court "considered the effects of conversion on Kane" and found that "each factor weighs at least somewhat against converting this case." RB at 38. But, Kane fails to address the numerous legal errors committed by the bankruptcy court in analyzing each of these conversion factors.

Kane asserts it was in his "inherent interest" to keep his earnings outside of the bankruptcy estate by remaining in chapter 7. RB at 39. But, conversion would benefit Kane by permitting him to pay down non-dischargeable debt over a period of five years while the automatic stay prevented any collection activity. This result comports with bankruptcy goals, including, maximization of the estate for the payment of creditors, avoiding arbitrary windfalls, providing Kane with a

"breathing spell" to allow him to reorganize his affairs, and preventing a "rush to the courthouse."

Kane's assertion that Zions is using "creative math" or that he is "better off not making any payments under a plan" are based on the false premise that the stay would not protect him and that in chapter 7 he could simply "deal with" non-dischargeable debt by limiting those creditors garnishment efforts to only 25% of his "available salary." RB at 43–44. Kane's argument is specious. The bankruptcy court erred by failing to apply the correct legal standards in analyzing these benefits to Kane.

### L.    Kane Could Obtain Permission to Pay His Non-Dischargeability Defense Costs From Property of the Estate Post-Conversion.

Kane raises a new argument in his Responsive Brief that if his case were converted to chapter 11, he would be "prohibited" from paying his attorney with estate funds to defend non-dischargeability litigation pursuant to section 330(a)(4)(A)(ii). RB at 42–43. This argument is erroneous.

Section 330 provides, in pertinent part, that the court may award compensation to professionals employed under section 327. Section 327(a) provides that the trustee or debtor in possession may employ, among others, attorneys. Section 330(a)(4)(A)(ii) provides that "the court shall not allow compensation for…(ii) services that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case."

Section 330(a) does not categorically *prohibit* compensation for a debtor's attorney's defense of non-dischargeability actions.  Assuming no trustee were appointed, Kane himself could hire his own attorney to defend the non-dischargeability actions against him.  And, section 330(a)(4)(A)(ii) does not prevent Kane from obtaining bankruptcy court could approval of compensation from the estate for such fees, as long as those fees were reasonably likely to benefit the estate and were necessary to the administration of the estate.  *See In re Schupbach Invs., LLC*, 521 B.R. 449 (B.A.P. 10th Cir. 2014) (holding that the bankruptcy court did not err in allowing chapter 11 debtor's counsel's fees for work on non-dischargeability action brought against principals of the corporate debtor, finding that the time spent benefited the estate), *aff'd sub nom. In re Schupbach Invs., L.L.C.*, 808 F.3d 1215 (10th Cir. 2015).

In Kane's case, it is not difficult to see how non-dischargeability defense might be considered reasonably likely to benefit the estate.  If Kane were not permitted to use estate funds to pay for counsel to assist him in defending non-dischargeability actions, he would need to either (a) obtain pro bono assistance, or (b) defend himself in pro per.  Pro bono assistance would obviate this "fee issue" entirely.  But, if Kane proceeded in pro per, his time and effort in defending himself in these multiple actions through trial might impact upon his hockey performance and possibly his "games played."  *See* RB at 24 (stating that "Kane's

salary is also based upon games played…"). Because of Kane's compensation structure, Kane's "games played" impacts upon the funds flowing (or not) into the estate under section 1115(a). *See* ZionsER-273 ¶ 18. Kane may be able to argue that hiring counsel to defend his non-dischargeability actions frees him up to focus on playing hockey and generating funds for the estate—i.e., a direct benefit to the estate (and to Kane). Accordingly, such fees could be compensable under section 330(a).

Whether such fees would be considered "necessary to the administration of the case" turns on whether the fees charged were reasonably needed to provide a benefit to the estate. *See, e.g.*, *In re Sarkis Invs. Co., LLC*, No. 2:13-BK-29180-RK, 2019 WL 9243005, at *22 (Bankr. C.D. Cal. 2019) (disallowing fees as being not "necessary to the administration of the case" where one of the attorneys who billed on the case was not an experienced bankruptcy attorney and would not be "argu[ing] any bankruptcy issues that arose in the case…") (citing 11 U.S.C. § 330(a)(4)(A)(ii)).

Here, there is no reason to belief that Kane's counsel would not exercise requisite prudent billing judgment, skill, and ability to provide a benefit to the estate by defending Kane in the context of non-dischargeability litigation. Such defense could be necessary and might provide a benefit to the estate. Accordingly,

section 330(a)(4) provides no per se barrier to Kane employing, or compensating from the estate, counsel to defend non-dischargeability claims against Kane.

And, if the case were converted and a trustee were appointed, for these same reasons a trustee could seek to employ counsel for Kane to defend non-dischargeability actions.  Indeed, one of the chapter 11 trustee's duties is to investigate the "acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1106(a)(3).  Nothing necessarily prevents the trustee from seeking to hire counsel to defend non-dischargeability actions where such defense would allow Kane to focus on hockey instead of defending these non-dischargeability actions in pro per.

Accordingly, section 330(a)(4)(A)(ii) does not categorically "prohibit" compensation to attorneys defending Kane in non-dischargeability actions.  The Court should reject Kane's arguments to the contrary.  The bankruptcy court also erred when it overlooked this section 330(a) analysis and when it gave weight to Kane's concern that "he will lose access to the funds he needs to defend any non-dischargeability litigation brought against him." ZionsER-383 lines 14–15.  This constitutes reversible legal error, which is reviewed de novo.

## M. Kane Has Failed to Rehabilitate the Bankruptcy Court's Errors in Denying Appointment of a Chapter 11 Trustee.

Kane does not dispute that Kane hired insolvency and restructuring counsel before he lost $1.5 million in gambling in 2020. *See* RB at 46–50. Kane also does not dispute that Kane's gambling losses were incurred while he was balance sheet insolvent by multiple millions of dollars, being sued by numerous creditors, and borrowing additional funds of upwards of $700,000.00 to pay gambling debts. *See* RB at 46–50. In fact, Kane asserts that the bankruptcy court considered "all of these facts" and still found that, among other things, Kane's acknowledging his gambling issues showed that he had made a "marked improvement." RB at 47–48. In Kane's words, "Having a problem with gambling, and hiring professionals to assist you, are not mutually exclusive." RB at n. 16. But, the bankruptcy court gave great weight to Kane's hiring insolvency counsel and professionals as purportedly demonstrating a "marked improvement" and a turning around of Kane's affairs. This finding is belied by the record, which demonstrates that Kane hired insolvency counsel before incurring $1.5 million in gambling losses and while he was significantly insolvent and being sued by numerous creditors. Kane has failed to rehabilitate the bankruptcy court's erroneous findings. The Court should reverse.

## III. __Conclusion__

The Court should reverse the bankruptcy court's Order Denying Motion to Convert (ZionsER-360–387) and remand with instructions for the bankruptcy court to convert this case to chapter 11 and to appoint a chapter 11 trustee. Alternatively, the Court should remand to allow the bankruptcy court to apply the correct legal rules to Zions' Motion to Convert.

DATED: October 7, 2021      FRANDZEL ROBINS BLOOM &
                            CSATO, L.C.
                            MICHAEL GERARD FLETCHER
                            GERRICK M. WARRINGTON


                            By:      /s/  Gerrick M. Warrington
                            _____
                            GERRICK M. WARRINGTON
                            Attorneys for Appellant Zions
                            Bancorporation, N.A., dba California
                            Bank & Trust

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with: (a) the type-volume limitations of Fed.

R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the brief exempted by

Fed. R. Bankr. P. 8015(g), it contains less than 6,483 words; and (b) the typeface

and type-style requirements of Fed. R. Bankr. P. 8015(a)(5) and 8015(a)(6),

respectively, because it uses a proportionally-spaced typeface using Microsoft

Word in 14 point Times New Roman font.


DATED: October 7, 2021        FRANDZEL ROBINS BLOOM &
                              CSATO, L.C.
                              MICHAEL GERARD FLETCHER
                              GERRICK M. WARRINGTON


                      By:      /s/  Gerrick M. Warrington
                             _____
                             GERRICK M. WARRINGTON
                             Attorneys for Appellant Zions
                             Bancorporation, N.A., dba California
                             Bank & Trust