1
2
3
4                        UNITED STATES DISTRICT COURT
5                      NORTHERN DISTRICT OF CALIFORNIA
6
7   ZIONS BANCORPORATION, N.A. dba            Case No. 21-cv-03765-WHO
    California Bank & Trust,
8                Appellant.
                                              ORDER ON BANKRUPTCY APPEAL
9       v.
10  EVANDER FRANK KANE,
11               Appellee.
12

        This is one of two appeals from a bankruptcy court order denying a motion to convert

appellee Evander Frank Kane's bankruptcy case from Chapter 7 to Chapter 11 under section

706(b) of the Bankruptcy Code.  Appellant Zions Bancorporation, N.A. ("Zions") also challenges

the court's decision not to appoint a Chapter 11 trustee.

        As in the companion appeal, *South River Capital, LLC v. Kane*, No. 21-CV-03493-WHO

(N.D. Cal. filed May 10, 2021), the bankruptcy court's order is AFFIRMED.  The court did not

abuse its discretion in declining to convert Kane's Chapter 7 case to Chapter 11, or in declining to

appoint a trustee.  The court did not apply the wrong legal standard or misapply the correct

standard in reaching its decisions.  Nor were its findings illogical, implausible, or unsupported by

the record.  The court correctly applied the relevant legal standards and considered the evidence

before it.  Any errors that did occur were harmless, given the context in which they were made and

the other factors contributing to the court's decision.  Zions may disagree with the court's

findings, but that on its own does not constitute a reversible error.

                                    **BACKGROUND**

**I.      KANE'S CHAPTER 7 PETITION**

        Kane is a professional hockey player who, at the time he filed for bankruptcy and the

United States District Court
Northern District of California

underlying motion was decided, played for the San Jose Sharks in the National Hockey League ("NHL").  *See* Appellant's Excerpts of R. ("ER") [Dkt. No. 5-1] 362.[1]  On January 9, 2021, he filed his Chapter 7 petition in the United States Bankruptcy Court for the Northern District of California, stating that he owned $10,224,743.65 in property and owed $30,191,340 in liabilities.[2]  *See id.*; *see also* ER at 009.  Kane stated that his debts were not primarily consumer debts.  *Id.* at 009.  Kane later amended his Schedules A/B, D, E/F, and J.  *See id.* at 076, 096.

As amended, Kane reported that his primary assets included three residential properties: one in San Jose, California, valued at $3,000,000; one in Vancouver, British Columbia, valued at $2,860,000; and another in Vancouver valued at $2,400,000.  *Id.* at 097-098.  He also listed assets including $40,000 in household items, $20,000 in clothes, $12,000 in electronics, $8,000 in firearms, and $1,250 in miscellaneous sports equipment.  *Id.* at 099-100.

Kane also listed substantial debt.  He reported 10 secured claims to various creditors, totaling $23,538,494.87, including $4,250,000 to Zions.  *Id.* at 076-082.  He also reported $4,396,525 in unsecured claims.  *Id.* at 084-093.

Kane calculated his monthly expenses at $93,214.46, including: $17,990.63 for home ownership expenses; $20,000 for other mortgages; $12,000 for childcare and children's education costs; $8,000 for food and housekeeping supplies; $8,910.83 for two vehicle leases; and $15,000 for support payments to relatives.  *Id.* at 105-106.

Kane also reported his monthly income.  His Schedule I listed only $2,083.33 in monthly income, from a podcast.  *Id.* at 040-041.  But he listed his occupation as a professional athlete employed by the San Jose Sharks and, in an attachment, disclosed that he had a "contract for personal services" with a $3,000,000 salary set for 2020-2021.  *Id.* at 040, 042.  The attachment— filed with Kane's Chapter 7 petition on January 9, 2021—stated that Kane's contract depended on the number of games played, which was uncertain due to the ongoing COVID-19 pandemic.  *Id.* at

---

[1] The page numbers reference the last three digits stamped on the bottom right of each page in the Appellant's Excerpts of Record.

[2] Kane's initial petition stated that he owed $26,837,340 in liabilities.  ER at 009.  The bankruptcy court, however, used $30,191,340 as the amount.  *Id.* at 362.

United States District Court
Northern District of California

042. Kane stated that the 82-game regular season already had been reduced to 56 scheduled games and that "[t]o the extent some of the games do not go forward because of the pandemic (or any other reason), [his] salary will be further reduced." *Id*. He also noted that under the operative collective bargaining agreement between the NHL players' union and team owners, 20 percent of his salary would be withheld and released to the owners under a "profit sharing" structure. *Id*. Finally, Kane stated that he "may terminate his contract" and "opt out of the season, as allowed under current rules," because of unspecified health concerns related to his child's birth. *Id*.

## II.    KANE'S NHL CONTRACT

The details of Kane's contract are significant to this appeal. Kane had a "standard player's contract" ("the contract") with the Sharks. *See id*. at 131. The relevant provisions include that the Sharks would employ Kane for eight "league years" beginning on July 1, 2018. *Id*. He would be paid:

- $3,000,000 for 2020-2021;
- $7,000,000 for 2021-2022;
- $5,000,000 for 2022-2023;
- $6,000,000 for 2023-2024; and
- $4,000,000 for 2024-2025.

*Id*.[3] In addition, Kane was eligible for two post-petition bonuses: one on July 1, 2022, and the other on July 1, 2024. *Id*. at 143. Each bonus was worth $2,000,000. *Id*.

The contract also requires in part that Kane be "fit and in proper condition for the performance of his duties." *Id*. at 132. If Kane suffers an employment-related injury that left him "disabled and unable to perform his duties as a hockey player"—for example, if he were injured during a game, while traveling with the team, or on team business—he is entitled to receive his remaining salary and signing bonuses. *See id*. at 133. But if he was "unfit to play skilled hockey" because of a non-hockey related injured, the team can suspend him without pay for the duration of

---

[3] Kane filed his Chapter 7 petition on January 9, 2021—five days before the start of the NHL's 2020-2021 season. *See* Appellant's Opening Brief [Dkt. No. 5] 18. Accordingly, only income earned after January 9, 2021, is relevant to this appeal.

1  that injury. *See id*. Under the terms of the contract, a physician selected by the team will

2  determine whether Kane is fit to play. *Id*. If Kane were to challenge that physician's

3  determination, the contract provides a multi-step process that involves bringing in a second and

4  potentially third physician. *Id*. at 133-136.

5      The contract further provides that Kane can be fined or suspended for violating reasonable

6  team rules. *Id*. at 132-133. If he were terminated without cause, the team must pay him a certain

7  portion of his salary, depending upon Kane's age upon termination. *Id*. at 139. If Kane were

8  terminated for cause, he would only be entitled to the compensation due to him at the time he was

9  notified of his termination. *Id*. at 140.

10     One final provision is worth noting. The contract also includes a "modified no-trade

11  clause" that requires Kane to provide the Sharks with a list of three other NHL teams to which the

12  Sharks may trade him during each season. *Id*. at 144.

13  **III.     THE BANKRUPTCY COURT'S ORDER**

14     On February 26, 2021, Zions moved to convert Kane's Chapter 7 case to Chapter 11 and

15  appoint a Chapter 11 trustee. *Id*. at 108. The "key reason" behind the motion was to bring Kane's

16  post-petition income—the $29,000,000 in salary and signing bonuses provided for in his

17  contract—into the estate, as would happen in Chapter 11 but not in Chapter 7. *See id*. at 120.

18  Zions argued that a trustee should be appointed to administer the estate, citing in part Kane's

19  "inability or unwillingness to maintain his own finances" and history of gambling. *See id*. Four of

20  Kane's creditors filed joinders to the motion: Professional Bank; South River Capital, LLC; Sure

21  Sports, LLC; and Lone Shark Holdings, LLC. *Id*. at 193, 199, 236, 239.

22     On April 19, 2021, Judge Stephen L. Johnson of the United States Bankruptcy Court for

23  the Northern District of California denied the motion. *Id*. at 361-362. His order opened with a

24  framework that is also helpful in understanding this appeal: In a Chapter 7 bankruptcy, the debtor

25  keeps his post-petition income, but in Chapter 11, that income belongs to the estate. Order at

26  1:20-2:1.[4] Given Kane's career and "substantial income," the court reasoned, the creditors

27

28  _____
[4] The bankruptcy court's order can be found at pages 361-386 of the Appellant's Excerpts of
Record. For ease of reference and readability, I cite to the order's native page and line numbers.

4

*Left margin:* United States District Court / Northern District of California

1   "reckon their chances of recovering on their claims would be improved substantially if he were

2   moved to Chapter 11." *Id*. at 2:1-3.

3            In denying the motion, the bankruptcy court considered a number of factors.  First was

4   Kane's ability to pay his creditors.  *Id*. at 12:22-13:20.  The court noted that although Kane had

5   "objectively significant" income, under the operative collective bargaining agreement, 10 percent

6   would be withheld for three years, and 20 percent withheld depending on whether the NHL met its

7   yearly revenue targets.  *See id*. at 12:27-13:13.  The court also noted the uncertainty surrounding

8   the pandemic's impact on the season, including whether the NHL would indeed hit those goals

9   and the number of games that would be played in an already-shortened season.  *See id*. at 4:8-13,

10  13:5-8.  Although conversion to a Chapter 11 plan would mean additional funds for Kane's

11  creditors, the court concluded that it was "not clear just how much."  *Id*. at 13:11-13.

12           Next, the court considered the possibility of immediate reconversion to Chapter 7.  *Id*. at

13  13:21-14:8.  It held that if Kane's history of gambling and spending continued, it would constitute

14  a mismanagement and diminution of the estate that would support reconversion.  *See id.*

15           Third, the court weighed the likelihood of a Chapter 11 plan's confirmation.  *Id*. at 14:9-

16  17:28.  Here, it cited a number of "practical and legal issues" that it determined "will make it

17  difficult for anyone in this case to confirm, let alone consummate, a plan."  *Id*. at 14:10-13.  Those

18  factors included: the potential for creditors with non-dischargeable claims to defeat confirmation;

19  Kane's ability to fund a plan long-term; the claimed security interests in Kane's future income; the

20  impact of the absolute priority rule; and the feasibility of a plan given the uncertain nature of

21  Kane's career.  *See id*. at 14:10-17:28.

22           Finally, the court considered the benefits of conversion to the parties in interest.  *Id*. at

23  18:1-20:19.  It determined that the benefits to the creditors were unproven, given the "significant

24  challenges" facing a Chapter 11 plan ("including challenges to priority and enforceability of

25  security interests, non-dischargeable claims, and the cost and expense of the trustee and

26  professionals") along with the uncertainty surrounding the amount of Kane's post-petition income

27  that would actually come into the estate.  *Id*. at 18:2-7.  Conversely, the court held, Chapter 7

28  would allow Kane to retain that income, more quickly discharge his debt, and, by avoiding the

United States District Court
Northern District of California

5

appointment of a trustee, retain his ability to make important decisions about his career. *See id*. at 18:15-20:19. Taken together, the court held, "each factor weighs at least somewhat against converting this case." *Id*. at 18:10.

The court also declined to appoint a trustee. *Id*. at 23:22-23. Relevant to this appeal, it noted that although Kane's "pre-petition financial decisions appear ill-considered," he "appears to have realized the disarray in his financial position and hired outside experts to restructure his affairs." *Id*. at 24:14-17. Although those efforts were ultimately unsuccessful, resulting in Kane's Chapter 7 filing, the court found that this showed "at least some understanding of his mistakes, and the need to correct them." *Id*. at 24:17-19. The court further determined that Kane's decision to hire restructuring counsel before filing signaled an intent to work with his creditors. *Id*. at 25:6-8. Even if the court were to convert the case, it concluded, Kane "has shown he should at least have the opportunity to prosecute it himself." *Id*. at 24:21-23.

Zions filed its notice of appeal on May 3, 2021. Dkt. No. 1.[5] Another creditor, South River, separately appealed the court's decision not to convert the case. *See South River Capital, LLC v. Kane*, No. 21-CV-03493-WHO (N.D. Cal. filed May 10, 2021).

## LEGAL STANDARD

A district court has jurisdiction to hear appeals from a bankruptcy court's final judgments, orders, and decrees. 28 U.S.C. § 158(a)(1); *see also Decker v. U.S. Trustee ("Decker II")*, 548 B.R. 813, 815 (D. Alaska 2015) (holding that the district court had jurisdiction to hear the appeal of a section 706(b) conversion order). A bankruptcy court's order denying conversion to Chapter 11 under section 706(b) is reviewed for an abuse of discretion. *See In re Parvin ("Parvin II")*, 549 B.R. 268, 271 (W.D. Wash. 2016); *In re LaFountaine*, 2016 WL 3344003, at *2 (9th Cir. BAP 2016). So is a bankruptcy court's decision regarding whether to appoint a Chapter 11 trustee. *See In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999). "A bankruptcy court abuses

---

[5] In the briefing on this appeal, Zions objected to Kane's request to supplement the record with the bankruptcy court's order regarding a claimed homestead exemption. *See* Dkt. No. 9-1. I need not rule on the objection, as the exemption was not relevant to my analysis. I also did not need to consider the court records that Zions requested I take notice of, all of which were filed after the bankruptcy court issued the order subject to this appeal. *See* Dkt. No. 9-2.

United States District Court
Northern District of California

1   its discretion if it applies the wrong legal standard, misapplies the correct legal standard, or if its

2   factual findings are illogical, implausible, or without support in inferences that may be drawn from

3   the facts in the record." *In re Plyam*, 530 B.R. 456, 461-62 (9th Cir. BAP 2015).

### DISCUSSION

### I.     THE DECISION NOT TO CONVERT TO CHAPTER 11

Under section 706(b) of the Bankruptcy Code, upon request of a party in interest, the court

may convert a Chapter 7 case to Chapter 11 without the debtor's consent.  11 U.S.C. § 706(b); *see

also Decker II*, 548 B.R. at 816 (holding that "there is no debtor consent requirement").  But

section 706(b) "does not provide guidance on what (or what not) to consider when reaching a

decision." *Decker II*, 548 B.R. at 817.  Courts have therefore concluded that the bankruptcy court

has "broad discretion in exercising this power based on a determination of what 'will most inure to

the benefit of all parties in interest.'" *Parvin II*, 549 B.R. at 271 (citations omitted).  "Since there

are no specific grounds for conversion, a court should consider anything relevant that would

further the goals of the Bankruptcy Code." *Id*. (citation omitted).  Courts traditionally consider

factors including: (1) the debtor's ability to repay the debt; (2) whether there are immediate

grounds for reconversion; (3) the likelihood of a Chapter 11 plan's confirmation; and (4) whether

the parties in interest would benefit from conversion. *Decker II*, 548 B.R. at 817 (citation

omitted).  "The burden is on the movant to show that the case should be converted." *In re Parvin

("Parvin I")*, 538 B.R. 96, 101 (Bankr. W.D. Wash. 2015) (citations omitted).

### A.  Ability to Pay

Zions first argues that the bankruptcy court erred by ignoring evidence of Kane's ability to

pay his creditors several million dollars in a Chapter 11 plan.  Appellant's Opening Brief at 24-30.

In support, it points to Kane's contract and the $29,000,000 in post-petition salary and bonuses

provided within. *Id*. at 14, 24-25.  Zions contends that this would yield between $3,298,000 and

$4,488,000 to unsecured creditors in Chapter 11, even if pandemic-related restrictions persisted

during the plan, Kane's 20 percent deductions were never repaid to him, and he did not reduce his

$1,100,000 in annual expenses. *Id*. at 25.  It bases these numbers on Kane's testimony at his

meeting of creditors, where he estimated that after taxes and fees, he took home between

7

$2,300,000 and $2,600,000 from an average annual salary of $7,000,000 (which Zions calculates as between 32.86 and 37.14 percent).[6] *Id*. (citing ER at 334-335).  Kane also stated that he netted roughly $1,400,000 to $1,500,000 of his $3,000,000 signing bonus in July 2020 (between 46.67 and 50 percent). *Id*. (citing ER at 340-341).  Applying the lowest percentages to Kane's projected post-petition income from January 2021 to December 2025, Zions calculates that he will net $10,081,800. *Id*.  Assuming Kane did not reduce his annual expenses, Zions estimates that he would spend $5,592,867.60 during that same five-year period. *Id*. at 25-26; *see also* ER at 045 (listing $93,214.46 in monthly expenses).  Zions's bottom line: $4,488,932.40 would be available to unsecured creditors in a Chapter 11 plan. *Id*. at 26.

There is no indication that the bankruptcy court ignored Kane's income in weighing his ability to pay his creditors.  The order references that income several times, proclaiming it "obvious that debtor has substantial income" and describing Kane's salary as "objectively significant."  Order at 12:23-24, 13:11.  "Obviously," the court wrote, "converting the case will mean additional funds for creditors." *Id*. at 13:12-13.  The issue for the court, however, was that it was "not clear just how much." *Id*. at 13:13.

The court's skepticism was supported by the record.  First, the court took into account the pay structure under the collective bargaining agreement, under which 20 percent of Kane's salary was withheld depending on NHL revenue and the additional 10 percent withheld as deferred compensation.  *See* Order at 12:25-26:8; *see also* ER at 272-273.  In a declaration supporting his opposition, Kane stated that if the NHL did not hit its yearly revenue targets, the 20 percent would go to the owners. ER at 272.  He further stated that the NHL did not meet its revenue targets for the 2019-2020 season and would not hit them for the 2020-2021 season given the pandemic-related restrictions on the number of games played and fans allowed to attend. *Id*.  The court considered this "at least some evidence" that the NHL would not meet its revenue targets and the 20 percent withheld from Kane's salary would not be returned to him.  *See* Order at 13:1-8.

---

[6] Although the specific amount of salary and bonuses varied season-to-season, Kane's seven-year contract with the Sharks was worth a total of $49,000,000, which amounts to an average of $7,000,000 per year.  *See* ER at 131, 143.

United States District Court
Northern District of California

The court also noted Kane's net income from his first paycheck in January 2021: $38,709, or only 18 percent of his gross earnings of $213,905. Order at 12:23-27; *see also* ER at 273. The court considered this evidence—along with the 30 percent of salary withheld and the unpredictability of the COVID-19 pandemic—and determined that it was "uncertain just how much of debtor's salary will be available to fund a plan." Order at 13:8.

The court did not find that Kane would be unable to pay his creditors. *See id.* at 13:4-13. Nor did it ignore evidence of his "objectively significant" salary. *See id.* at 13:11. Rather, it weighed the evidence of that income against evidence indicating that Kane's ability to pay was not as certain as Zions argued. Given the terms of the collective bargaining agreement, Kane's take-home pay from his paycheck, and the risks the ongoing pandemic posed to the hockey season, the court's findings were not illogical, implausible, or without support. Zions obviously disagrees with the bankruptcy court's decision. But the court did not clearly err in reaching it.[7]

## B. Grounds for Immediate Conversion

Zions also argues that the bankruptcy court "misapplied the reconversion prong by declining to consider Zions's request to appoint a Chapter 11 trustee." Appellant's Opening Brief at 43. This point is at times difficult to follow. Zions first focuses on the court's finding that it was not relevant whether a party in interest *would* seek reconversion, but whether one *could*. *Id.* at 43 (citing Order at 13 n.7). Zions contends that the legal standard requires the court to "analyze the actual prospects that reconversion would render conversion a 'futile and wasted act'" (using language from *In re Decker ("Decker I")*, 535 B.R. 828, 840 (Bankr. D. Alaska 2015)). *Id.* at 44. Then, Zions argues that rather than consider whether reconversion would render conversion futile, the court improperly "looked to the record to see if grounds for reconversion existed in a vacuum." *Id.* at 43-44. In doing so, it contends, the court "pointed to the very same grounds that Zions argued supported the imposition of a Chapter 11 trustee"—namely, Kane's history of gambling

---

[7] Nor did the court err in considering the administrative costs of converting the case and appointing a Chapter 11 trustee. *See* Order at 13:14-20. Zions argues that the court improperly assumed the possibility of "administrative insolvency." Appellant's Opening Brief at 28-29. Although the court held that administrative costs "could consume a material portion of a Chapter 11 estate," undercutting Zions' arguments about Kane's ability to pay, it did not go so far as to say that those costs would result in insolvency. *See* Order at 13:14-20.

United States District Court
Northern District of California

1   and spending.  *See id.* at 44; *see also* Order at 13:22-14:8.

2        But it seems that Zions splices the relevant guidance from *Decker I*, which is that in

3   deciding a section 706(b) motion, courts consider in part "whether there was cause for the

4   immediate dismissal or reconversion of the case under § 1112(b) that would render conversion to

5   chapter 11 a 'futile and wasted act.'"  *See* 535 B.R. at 840.  This does not present the either/or

6   scenario that Zions seems to imply.  Section 1112(b) provides for conversion or dismissal "for

7   cause," defining "cause" as a number of actions including "substantial or continuing loss to or

8   diminution of the estate" or "gross mismanagement of the estate."  *See* 11 U.S.C. § 1112(b)(1),

9   (b)(4).  My reading of *Decker I* is that if a court found that such cause existed, it would then have

10  grounds to convert the case back to Chapter 7—rendering conversion from Chapter 7 to Chapter

11  11 a "futile and wasted act."  *See* 535 B.R. at 840.

12       That is what the court took into account in weighing whether grounds existed for

13  reconversion.  It determined that if Kane's history of gambling and spending continued, that

14  would constitute the mismanagement or diminution of the estate.  Order at 13:22-14:6.  "Those

15  facts," the court wrote, "would then support reconverting the case" under section 1112(b)(4).  *See*

16  *id*. at 14:1-6.

17       Zions offers a more succinct summary of its argument in its reply: "The bankruptcy court

18  in this matter erred under *Decker* by failing to consider whether conversion would be rendered

19  futile if a trustee were appointed post-conversion."  Appellant's Reply Brief [Dkt. No. 9] 22-23.

20  But *Decker* does not require courts to consider the appointment of a trustee.  *See* 535 B.R. at 840.

21  Instead, it states that courts look to "whether there was cause for the immediate dismissal or

22  reconversion" of the case—i.e., whether there were grounds for doing so.  That is what the

23  bankruptcy court examined here.  There was no error in its application of *Decker I*.

24                    **C.  Likelihood of Plan Confirmation**

25       Next, Zions contends that the bankruptcy court erred by assuming a hypothetical Chapter

26  11 plan that "suffered from unnecessary problems" while "failing to consider reasonably likely

27  alternatives and obvious solutions to those problems which would have permitted confirmation."

28  Appellant's Opening Brief at 30.  It points to no law requiring bankruptcy courts to consider

10

1    "reasonably likely alternatives and obvious solutions" to problems that might impede confirmation

2    of a Chapter 11 plan. *See id*. at 30-36. Instead, it argues that the court either erred in assuming

3    these problems based on the applicable law and factual record or overlooked solutions based on

4    the same. *See id*.

### 1.   Creditor Objections

6    Zions's first set of arguments relate to potential objections by creditors, which the court

7    held would likely frustrate the confirmation of a Chapter 11 plan. *See* Order at 14:14-15:5, 16:2-

8    17:14. Specifically, Zions argues that the court erred by "assuming" that unsecured creditors

9    "would object to a plan that pays them something when the alternatives are (a) reconversion to

10   Chapter 7 or (b) dismissal." Appellant's Opening Brief at 31. Even if the creditors objected,

11   Zions contends that the court further erred by assuming that a plan could not be confirmed, either

12   by Kane committing five years' worth of disposable income to a plan or through a "cramdown"

13   scenario. *Id*. at 33-35.

14   A brief primer is helpful in understanding the solutions that Zions contends the bankruptcy

15   court ignored. Under section 1129(a)(15) of the Bankruptcy Code, if an allowed unsecured

16   creditor objects to a Chapter 11 plan, "the debtor must commit all of his projected disposable

17   income for at least five years." *In re Juarez*, 603 B.R. 610, 627 (9th Cir. BAP 2019). In this

18   context, "projected disposable income" is considered the "monthly income minus certain

19   reasonable expenses for support and maintenance obligations," taking into account "known or

20   nearly certain information about changes in a debtor's earning power during the plan period." *See*

21   *id*. (citations omitted).

22   "Generally, a bankruptcy court may confirm a Chapter 11 plan only if each class of

23   creditors affected by the plan consents." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566

24   U.S. 639, 641 (2012) (citing 11 U.S.C. § 1129(a)(8)). There is an exception to that rule—referred

25   to as a "cramdown plan"—that allows confirmation of nonconsensual plans so long as "the plan

26   does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or

27   interests that is impaired under, and has not accepted, the plan." *See id*. at 641-42 (citing 11

28   U.S.C. § 1129(b)). For a plan to be "fair and equitable" to unsecured creditors, it must either

1   provide for "full payment of the dissenting class" or that "no junior class will receive or retain

2   anything under the plan." *Juarez*, 603 B.R. at 622.  "This last criterion is called the absolute

3   priority rule." *Id.*

4          It is worth noting that it does not appear from the record that Zions raised either argument

5   before the bankruptcy court.  Its motion to convert was silent about the likelihood of confirmation

6   of a Chapter 11 plan, focusing instead on Kane's ability to pay his creditors and benefits to the

7   interested parties before arguing that a trustee should be appointed upon conversion.  *See* ER at

8   120-125.  Its reply mentioned Kane's argument about potential priority disputes and

9   dischargeability litigation stymieing confirmation, but made no mention of section 1129(a)(15) or

10  a cramdown plan as a means of overcoming creditors' objections.  *See id.* at 320-321.

11         In any case, the court contemplated evidence relevant to both Kane's projected disposable

12  income and Zions's hypothetical cramdown plan.  As discussed in greater detail above, the

13  bankruptcy court considered Kane's income in weighing the motion to convert.  It also looked at

14  potential changes to his earning power during a plan period, contemplating that his "highest

15  income-earning years are immediately in front of him," the pandemic's impacts on the upcoming

16  season, and Kane's ability to play hockey long-term.  *See* Order at 4:9-11, 15:6-16.

17         The court also considered the absolute priority rule, which it determined was "also likely to

18  complicate confirmation of a plan." *Id.* at 16:5-6.  The discussion focused on Kane's ability to

19  keep any non-exempt property or contribute new value should unsecured creditors object. *See id.*

20  at 16:5-21.  Although the court did not expressly mention the possibility of a cramdown plan, it

21  appears to have considered the absolute priority rule in the context of objecting unsecured

22  creditors.  *See id.* at 16:5-14.  Zions might disagree with the court's ultimate decision about the

23  absolute priority rule's impact on confirmation, but it does not appear that the court ignored the

24  record or otherwise erred in so deciding.

25         There was no error here.  The court considered evidence relevant to both of the solutions

26  that Zions now proposes.  And it did not ignore any argument by Zions about these solutions, as it

27  appears none was made.  Instead, relying on its "long experience," the bankruptcy court made

28  logical, plausible, and supported findings regarding the potential roadblocks that objecting

creditors might pose to a Chapter 11 plan's confirmation.  *See* Order at 14:10-13.

### 2.  Injunction or Automatic Stay

Zions then argues that the court made an erroneous legal conclusion when it declared that "nothing in the Code" would prevent creditors with non-dischargeable claims from continuing to collect from Kane outside the plan.  Appellant's Opening Brief at 36-40 (citing Order at 17:12-13).  It contends that the court erred in assuming that Kane would need an impermissible injunction to keep such creditors at bay and ignoring a statutorily provided, automatic stay that would do the same. *See id.* at 36-40 (citing 11 U.S.C. §§ 362, 1141(d)(5))

The court determined that even if a Chapter 11 plan were confirmed, "if creditors are successful in having their claims declared non-dischargeable, nothing in the Code will prevent them from continuing to collect from debtor outside the plan." *See* Order at 16:22-17:14.  The court relied heavily on *In re Hamilton*, 803 F. App'x 123, 124-25 (9th Cir. 2020), where the Ninth Circuit held that a bankruptcy court erred in approving a plan provision that enjoined creditors from collecting non-dischargeable debt during the plan period.

Although Kane and Zions disagree whether the statutory stay would indeed bar creditors from collecting any non-dischargeable claims during a Chapter 11 plan, it appears that the court overlooked the possibility that it might. *See* Appellee's Brief [Dkt. No. 8] 30-31; Appellant's Opening Brief at 36-37.  The court did not discuss the stay, let alone whether it might apply to Kane's case. *See generally* Order.  It instead focused on *Hamilton*, where the majority considered only the injunction provision, not any stay. *See id*. at 16:22-17:14; *see also Hamilton*, 803 F. App'x at 124-25.

But even if the court erroneously asserted that nothing in the Bankruptcy Code would prevent creditors with non-dischargeable claims from collecting from Kane outside the plan, any error was harmless.  The court's broader point was that creditors with non-dischargeable claims would have competing interests that could impede plan confirmation. *See* Order at 16:22-17:14.  Regardless of whether they would actually be able to collect from Kane outside the plan, the court's concern was legitimate.  At minimum, it recognized that such creditors might object to a plan that would "delay or reduce their recoveries." *Id*. at 16:22-17:1.  While the court's specific

statement about the Code might have been inaccurate, any error was harmless given the context.

### 3.  Potential Hockey Injuries

Next, Zions argues that the court erred in finding that any future hockey injuries could prevent a Chapter 11 plan from being feasible.  Appellant's Opening Brief at 40.  Specifically, it contends that the court ignored the provision in Kane's contract stating that he would continue to receive his full salary and bonuses even if he were injured while playing hockey or during hockey-related travel.  *Id*. at 41 (citing ER at 133).

As part of its decision related to plan confirmation, the court noted that Kane's career "is one in which physical injuries are not uncommon."  Order at 17:15-16.  It went on to state that the "uncertainty of debtor's ability to perform as a professional athlete, and the possibility of injury taking him off the ice—temporarily or otherwise—mean the kind of long-term plan implied by Zions's request has serious feasibility concerns that will only grow as the years go by."  *Id*. at 17:16-19.  The court went on to discuss that unpredictability in broader terms, describing the "attendant uncertainty and risk" in Kane's career and the court's concern about a Chapter 11 plan "so dependent on debtor continuing to play hockey for several years without interruption."  *Id*. at 17:24-28.

Elsewhere in the order, the court discussed Kane's contract in detail, including the terms regarding his health and ability to work.  *See* Order at 5:8-9.  Specifically, it noted that if Kane were injured, the team-designated doctor would determine if Kane was able to work and if there was any dispute, the contract invoked "extensive and complicated provisions."  *Id*. at 5:9-18.  The court also noted that Kane would only be paid if his injury or disability occurred during the course of his employment—i.e., during hockey or hockey-related travel.  *See id*.

It does not appear, then, that the court ignored the contract term providing that Kane would continue to receive his full salary if he suffered a hockey-related injury.  Given the contract's other provisions, it was not illogical or implausible for the court to assume that there might be disputes over any injuries Kane suffered and his subsequent ability to play.  *See, e.g., id.* at 19:25-26 (noting that under the contract, "the Sharks make the call on debtor's ability to play" and that it was "up to debtor to contest that call").  In other words, the evidence shows that the "uncertainty

14

United States District Court  
Northern District of California

1   and risk" related to Kane's ability to play hockey are not necessarily limited to the injury itself, but

2   the team's evaluation of any injury and Kane's ability to play—and thus, whether he would

3   continue to be paid under the contract.

4        Moreover, as Kane notes in his opposition, this argument "overlooks all of the other risk

5   and uncertainty associated with the career of a professional athlete."  Appellee's Brief at 33.

6   Indeed, the court highlighted contract provisions that allowed the Sharks to terminate Kane or

7   suspend him without pay.  Order at 5:19-25.  It also noted that if Kane were terminated without

8   cause, he would receive a reduced salary payment over twice the original contract's length, but if

9   he were terminated for cause, he would not be compensated.  *Id*.  Commonsense dictates that there

10  are any number of reasons why a professional athlete might not play a sport for "several years

11  without interruption," beyond injuries.  *See id*. at 17:28.  For example, the player might be traded,

12  or terminated and then sign with another team.[8]

13       For these reasons, the court did not clearly err in its analysis of Kane's NHL contract.

14  Even if it did overlook the contract term providing for the payment of Kane's salary and bonuses

15  if he were to suffer a hockey-related injured, any error was harmless and outweighed by the other

16  risks and uncertainties presented by Kane's career.

### 4.  Security Interests in Post-Petition Income

18       Finally—at least on this issue—Zions contends that the court erred in considering whether

19  any claimed security interests in Kane's future income might thwart confirmation.  Appellant's

20  Opening Brief at 42-43.  Zions argues that any such interests were void and unenforceable as a

21  matter of law.  *Id*. at 42.

22       The court noted that at least some of Kane's creditors asserted a security interest in his

23  future income, which it determined "imperils confirmation of a plan, as it appears substantially all

24  of debtor's income—the primary source of funding for a plan—will apparently be devoted to

United States District Court
Northern District of California

---

[8] Indeed, while this appeal was pending, the Sharks terminated Kane's contract.  *See* Dkt. No. 20 at 2:15-17.  He then signed a one-year contract with the Edmonton Oilers.  *See id*.  This was brought to my attention when Kane filed a motion to dismiss this appeal, arguing that because the Sharks contract was terminated, and because Zions relied on that contract in arguing for conversion, I could not grant effective relief, meaning Zions's appeal was moot.  *See id*. at 3.  I denied the motion.  *Id*. at 1.

1   paying purportedly secured creditors." *See* Order at 15:15-16:4.  But it declined to determine

2   whether these interests were valid or enforceable, despite citing a Ninth Circuit Bankruptcy

3   Appellate Panel decision holding that they were not.  *See id.* (citing in part *In re Skagit Pac. Corp.*,

4   316 B.R. 330, 336 (9th Cir BAP 2004)).

5          As I stated in my Order denying South River's appeal, it is unclear why the court weighed

6   the potential impact of security interests in Kane's post-petition income when it simultaneously

7   acknowledged that the Ninth Circuit had held that such interests were invalid.  But any error was

8   harmless.  The court's consideration of pre-petition security interests on post-petition salary was

9   but one of several factors it weighed in assessing the likely confirmation of a Chapter 11 plan,

10  including the competing interests of creditors and the nature of Kane's career.  These factors

11  support the court's finding, regardless of any error in considering security interests on Kane's

12  post-petition earnings.

13         For all of these reasons, the court did not clearly err in considering whether there were

14  grounds for immediate reconversion.  To the extent that any error occurred, it was harmless.

15                       **D.  Benefits to Interested Parties**

16         I now turn to the court's final consideration, whether the parties in interest would benefit

17  from conversion.  Zions argues that the court "erred by overlooking key benefits to Kane and the

18  estate while, at the same time, identifying purported drawbacks which were nonexistent."

19  Appellant's Opening Brief at 45.

20         Zions's first point is easily disposed of.  It contends that conversion would benefit both the

21  estate and creditors because Kane's salary would become part of the estate in Chapter 11.  *Id.* at

22  45.  But the bankruptcy court acknowledged this, writing that "[c]onversion would certainly bring

23  debtor's post-petition salary into the estate."  Order at 18:2-3.  However, for reasons already

24  explained, the court determined that "uncertainty exists as to the amount of income" available and

25  considered that income alongside "significant challenges" awaiting in Chapter 11.  *Id.* at 18:1-9.

26  The court clearly considered this benefit to creditors, it simply afforded it different weight than

27  Zions does.

28         Next, Zions asserts that the court's finding that conversion would impair Kane's interest in

United States District Court
Northern District of California

1    a "relatively quick and final resolution to his current financial troubles" is undermined by Kane's

2    ability in a Chapter 11 plan to pay down non-dischargeable debt while being protected by the

3    statutory stay.  Appellant's Opening Brief at 46-47 (citing Order at 20:18-19).  Conversely, Zions

4    argues, in Chapter 7, the stay would not apply and Kane's earnings "would immediately become

5    subject to execution and garnishment" upon discharge.  *Id*. at 47.

6           Zions does not assert that the court applied the wrong legal standard or misapplied the

7    correct one.  *See id*. at 46-47.  Nor does it argue that the court's findings are illogical, implausible,

8    or unsupported.  *See id*.  It merely asserts a difference of opinion between Zions and the

9    bankruptcy court about whether Kane fares better in Chapter 7 or in Chapter 11.  A difference of

10   opinion does not amount to an error.

11          Zions's third argument is also not compelling.  It contends that the bankruptcy court's

12   "finding" that by sending Kane's income to the estate, he would "lose access to the funds he needs

13   to defend any non-dischargeability litigation brought against him" was in error, because Kane

14   could request permission from the court to use estate property to defend himself.  *See id*. at 47-48

15   (citing Order at 23:13-15).

16          This was not a "finding" by the court, as Zions asserts.  The court articulated *Kane's*

17   concern about losing access to these funds, it did not state that he would in fact lose them.  *See*

18   Order at 23:13-15 ("He is concerned that if the case is converted, he will lose access to the funds

19   he needs to defend any non-dischargeability litigation brought against him.").  Kane's concerns

20   about litigation was not unfounded; as of the issuance of the bankruptcy court's order, two

21   creditors had already filed adversary proceedings seeking non-dischargeability determinations.

22   *See id*. 14 n.8.  Moreover, the statute upon which Zions relies is, as it effectively concedes,

23   permissive in nature.  The trustee "may use, sell, or lease, other than in the ordinary course of

24   business, property of the estate," but only "after notice and a hearing."  *See* 11 U.S.C. § 363(b)(1).

25   The bankruptcy court could deny Kane's request.  Therefore, any assumption by the court that

26   Kane might lose funding to defend himself was not in error.

27          Next, Zions argues that the court erred in finding that conversion and appointment of a

28   trustee would "significantly impair debtor's right to make central choices in life, such as his

United States District Court
Northern District of California

17

professional hockey career." Appellant's Opening Brief at 49 (citing Order at 19:11-12). The court first pointed to the modified no-trade clause requiring Kane to choose three teams he would play for if traded. *See* Order at 19:15-22; *see also* ER at 144. This type of decision, the court wrote, "depends on circumstances that only debtor could meaningfully evaluate like the quality of the team, its location, and the other players"—an "important choice" that it held would fall to a trustee if one were confirmed. *See* Order at 19:16-20. Next, the court referenced the contract provisions governing Kane's fitness and ability to play, specifically that it was up to Kane to contest the team doctor's determination. *Id*. at 19:23-20:2. It concluded that it made "little sense" to give a trustee the power to make any such challenge, particularly if the trustee is balancing creditors' rights to payment against debtor's health choices." *See id*. at 19:26-28.

Zions contends that a trustee would not have this decision-making power because a trustee could not assume Kane's contract without his consent. Appellant's Opening Brief at 48-49. Zions relies on section 365(c) of the Bankruptcy Code, which provides in relevant part:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> > (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment or rights or delegation of duties; and
>
> > (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1). It claims that because Kane's NHL contract is an executory contract and a personal services contract, "the choice to assume the NHL contract would be subject to Kane's express consent." Appellant's Opening Brief at 50.

Setting aside the nature of Kane's contract, it appears that it is Zions who misreads the law. Subsection (1)(A) expressly distinguishes between a "party" to the contract and "the debtor," and subsection (1)(B) awards the power of consent to "such party"—not "the debtor." *See* 11 U.S.C. § 365(c)(1). The Ninth Circuit's read of the provision in a seminal section 365(c) case is also compelling. In *In re Catapult Entertainment, Inc.*, 165 F.3d 747 (9th Cir. 1999), the court wrote

United States District Court
Northern District of California

that subsection 365(c)(1) "by its terms permits assumption and assignment of executory loan agreements *so long as the nondebtor consents*." *Id*. at 753 (emphasis in original). Later in the opinion, the court held that "where applicable nonbankruptcy law makes an executory contract nonassignable because the identity of the nondebtor party is material, a debtor in possession may not assume the contract absent consent of the nondebtor party." *Id*. at 754-55. Although the Ninth Circuit was not squarely presented with the same issue now before me, it repeatedly focused its attention on the consent of the *nondebtor party* in answering the question at hand. *See also In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092 (9th Cir. 1991) (stating that subsection 365(c)(1) "explicitly prohibits assumption *only* when the non-debtor party to the contract does not consent") (emphasis in original). It appears then, that Kane's consent would not matter—and therefore, that the court did not err in assuming that a trustee would be able to assume the contract and make decisions on Kane's behalf.

Finally, Zions asserts that the bankruptcy court erroneously concluded as a matter of law that Kane would only receive a Chapter 11 discharge "if a plan is confirmed and then only if payments are complete." Appellant's Opening Brief at 50-52 (citing Order at 20:14-16). According to Zions, the court overlooked two other provisions in the Bankruptcy Code, sections 1127(e) and 1141(d)(5)(B), which would allow Kane to modify a confirmed plan or, if modification was not practicable, allow a discharge if Kane had not completed payments so long as unsecured creditors received as much as they would have in Chapter 7. *See id*. at 51 (citing 11 U.S.C. §§ 1127(e), 1141(d)(5)(B)).

Again, context is useful in understanding the court's remark. The court emphasized Kane's interest in a more expeditious discharge of his debts. *See* Order at 19:1-3 (describing one of Kane's "primary, and most obvious interests" as obtaining a "timely discharge of his debts"), 20:18-19 (discussing Kane's interest in a "relatively quick and final resolution to his current financial troubles"). Discharge takes longer in Chapter 11 than it does in Chapter 7—in fact, it contends that in general, an individual in Chapter 11 does not receive a discharge for five years. *See* Appellant's Opening Brief at 37. Even if Kane were to obtain a modification or early discharge under the cited provisions, discharge in Chapter 11 will inherently take longer.

1    Converting the case therefore inherently undercuts Kane's interest in a "relatively quick" or

2    "timely discharge of his debts," as the bankruptcy court noted. *See* Order at 19:1-3, 20:18-19.

3         Moreover, Zions ignores the requirement that before a plan can be modified, it must be

4    confirmed. Sections 1127(e) and 1141(d)(5)(B) only apply after a plan is confirmed. *See* 11

5    U.S.C. §§ 1127(e), 1141(d)(5)(B). Given the court's concerns about the creditors' competing

6    claims and interests, it was not illogical or implausible for it to infer that confirmation itself would

7    be an arduous process. Even if a plan were confirmed, any delay in that process would

8    subsequently delay Kane's ability to discharge his debts. He then would either have to: (1)

9    complete all payments under section 1141(d)(5)(A) or (2) seek modification or early discharge

10   under the provisions Zions cited. Even then, modification or early discharge would not be a

11   guarantee. *See id.* § 1127(e) ("the plan *may* be modified") (emphasis added); § 1141(d)(5)(B)

12   ("the court *may* grant a discharge to the debtor who has not completed payments under the plan")

13   (emphasis added). In either scenario, the resolution of Kane's bankruptcy will take longer in

14   Chapter 11 than in Chapter 7.

15        To the extent that the court overlooked the possibility of modification or early discharge,

16   any error was harmless, as it did not detract from the court's finding: Kane had an interest in a

17   timely discharge of his debts, which would take longer were the case converted to Chapter 11.

18        For all of these reasons, the bankruptcy court did not abuse its discretion in denying

19   Zions's motion to covert Kane's Chapter 7 case to Chapter 11. Any error that the court made was

20   harmless. The bankruptcy court's decision is therefore AFFIRMED.

21   **II.    THE DECISION NOT TO APPOINT A TRUSTEE**

22        Under section 1104(a) of the Bankruptcy Code, the bankruptcy court may appoint a

23   Chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross

24   mismanagement of the affairs of the debtor by current management, either before or after the

25   commencement of the case." *Id.* § 1104(a)(1). The same provision allows the court to appoint a

26   trustee "if such appointment is in the interests of creditors." *Id.* § 1104(a)(2).

27        Zions's final argument is that the bankruptcy court erred in declining to appoint a Chapter

28   11 trustee. Appellant's Opening Brief at 52-53. It focuses on the court's finding that Kane

United States District Court
Northern District of California

"realized the disarray in his financial position and hired outside experts to restructure his affairs" before filing his Chapter 7 petition, which the court believed showed "at least some understanding of his mistakes, and the need to correct them." *Id*. at 52 (citing Opinion at 24:15-19). Zions also points to the court's finding that Kane's "decision to hire restructuring counsel prior to filing this bankruptcy shows an intent to work with his creditors." *Id*. (citing Opinion at 25:6-7).

Zions makes much of the timing of when Kane hired that counsel. *See id*. It contends that, according to Kane's testimony, he hired insolvency counsel in October 2019, "*before* he incurred $1,500,000 in gambling losses." *Id*. (emphasis in original). "Contrary to the bankruptcy court's findings," Zions contends, "Kane hired insolvency and restructuring counsel before he went on a gambling spree, losing [$1,500,000] while he was hopelessly insolvent and being sued by multiple creditors."

It is unclear where any purported error occurred. The court's point was that Kane tried to get his financial affairs in order, including by hiring restructuring counsel, before he filed for bankruptcy. The facts emphasized by Zions—that Kane hired counsel in October 2019, before incurring gambling losses—do not contradict the court's finding that he hired counsel before filing his Chapter 7 petition in January 2021. If Zions's point is that Kane's gambling undermined the court's finding that Kane had "at least some understanding of his mistakes," the court did not wholly absolve Kane's pre-petition behavior. The court described his pre-petition financial decisions as "ill-considered" and acknowledged that his prior conduct could constitute gross mismanagement of the estate. *See* Order at 24:14-23. Even so, the court determined, considering Kane's pre-petition efforts to restructure his finances and post-petition compliance with the Bankruptcy Code, he had "shown he should at least have the opportunity" to prosecute his bankruptcy himself. *Id*. at 21-23.

Based on the record, this finding was not illogical, implausible, or unsupported. The court did not abuse its discretion in declining to appoint a Chapter 11 trustee. Its decision is again AFFIRMED.

## CONCLUSION

The bankruptcy court's order is AFFIRMED.

**IT IS SO ORDERED.**

Dated: July 22, 2022



William H. Orrick
United States District Judge